OPINION OF THE COURT
Chief Judge Wachtler.
In People v De Bour (40 NY2d 210, 223), we set out a four-tiered method for evaluating the propriety of encounters initiated by police officers in their criminal law enforcement capacity. If a police officer seeks simply to request information from an individual, that request must be supported by an objective, credible reason, not necessarily indicative of criminality. The common-law right of inquiry, a wholly separate level of contact, is “activated by a founded suspicion that criminal activity is afoot and permits a somewhat greater *185 intrusion” (People v De Bour, supra, at 223). Where a police officer has reasonable suspicion that a particular person was involved in a felony or misdemeanor, the officer is authorized to forcibly stop and detain that person. Finally, where the officer has probable cause to believe that a person has committed a crime, an arrest is authorized.
In the two cases before us, we revisit De Bour in order to clarify the difference between a request for information and the common-law right of inquiry. Because the two terms on their face are so close in meaning, the legal significance we intended each to have has become obscured. The result has been inconsistency in the evaluation of markedly similar police encounters.
We are convinced that the four-part De Bour analysis still has vitality. Each progressive level, however, authorizes a separate degree of police interference with the liberty of the person approached and consequently requires escalating suspicion on the part of the investigating officer. We conclude, as a general matter, that a request for information involves basic, nonthreatening questions regarding, for instance, identity, address or destination. As we stated in De Bour, these questions need be supported only by an objective credible reason not necessarily indicative of criminality. Once the officer asks more pointed questions that would lead the person approached reasonably to believe that he or she is suspected of some wrongdoing and is the focus of the officer’s investigation, the officer is no longer merely seeking information. This has become a common-law inquiry that must be supported by a founded suspicion that criminality is afoot.
I. People v Hollman
On November 4, 1989, Richard Canale, an undercover narcotics officer on duty at the Port Authority Bus Terminal in New York City, observed the defendant Troy Hollman coming down an escalator. The defendant was carrying an orange bag and appeared to be looking around the lower level of the terminal as he descended. When he reached the bottom, he looked around again and then went back up the escalator.
A few minutes later, Canale again observed defendant coming down the escalator, this time with a companion, who was carrying a black knapsack. Canale continued to watch the defendant and his companion. The two spoke briefly in front of a men’s room, and then separated, standing 10 feet apart *186 with the defendant’s orange bag placed on the ground between them. The two maintained these positions for approximately 20 minutes. The defendant retrieved his bag, went into the men’s room, and was followed by his companion. After the two exited the men’s room, they resumed their positions. About 15 minutes later, they boarded a bus. The defendant placed his orange bag in the overhead rack two or three seats up from the seat which he eventually took for himself. The defendant’s companion placed his bag directly above his seat, but defendant reached up and pushed his companion’s bag closer to his own bag. The two sat together in the rear of the bus.
Canale approached the two men, identified himself as a narcotics officer and requested their permission to ask a few questions. At this time, Canale was either standing in front of, or kneeling upon, the seat directly in front of the defendant and his companion. A second officer was located behind Canale.
Canale asked the two if they were traveling together and the defendant answered that they were not and that they had just met. The officer then asked them where they were headed; the defendant said he was going to Virginia, while his companion stated that he was going to "Carolina.” Finally, Canale asked where the defendant had checked his luggage. The defendant replied that they did not have any luggage or carry-on bags. When addressed directly, the defendant’s companion gave the same answer. The two denied that the orange bag and the black knapsack belonged to them. The officer asked other passengers whether the bags belonged to them. When they too denied ownership of the bags, the officer opened them, finding less than an ounce of crack cocaine in a sneaker box in the orange bag and empty plastic vials and some white powder in the knapsack.
Hollman was charged with criminal possession of a controlled substance in the first and third degrees, criminally using drug paraphernalia in the second degree and endangering the welfare of a child. The defendant moved to suppress the drugs, claiming that the search and seizure had been unlawful. A suppression hearing was conducted on March 5, 1990, and the defendant’s motion was denied. The suppression court concluded that Canale’s observations were sufficient to provide him with a founded suspicion that criminality might be afoot, which entitled him to make an inquiry.
After the defendant’s suppression motion was denied, count *187 one of the indictment, charging criminal possession of a controlled substance in the first degree, was dismissed and defendant pleaded guilty to third degree possession in full satisfaction of the indictment. He appealed to the Appellate Division, which affirmed the judgment of the lower court. On appeal, the defendant argued that Canale’s conduct constituted a seizure that needed to have been supported by reasonable suspicion of an actual or imminent crime. The Appellate Division determined that this argument was unpreserved, but reached it in the interests of justice and found the officer’s conduct to have been proper. The court found that the officer’s questions constituted a request for information that needed to be supported only by an objective, credible reason not necessarily indicative of criminality. Finally, the court concluded that the orange bag had been abandoned. A Judge of this Court granted the defendant’s application for leave to appeal.
II. People v Saunders
On February 1, 1989, Officer Canale, this time accompanied by two other officers, was stationed near Platform 68 at the Port Authority Bus Terminal. Buses departing from this platform head for Baltimore, Washington and Virginia. Canale observed the people standing in line for the 5:00 p.m. bus. The bus began boarding at approximately quarter to five. The defendant joined the line at about five minutes to five. The defendant was carrying a zippered gym bag. According to Canale, in contrast to the other passengers, who were casual in demeanor, the defendant appeared nervous, scanning the interior of the boarding area and at one time giving his place in line to another passenger.
Canale observed the defendant for approximately five minutes. When the defendant approached the bus, he caught Canale’s eye, hesitated slightly, and entered the boarding area. Canale approached the defendant, with the other two officers standing two to three feet behind him. He identified himself as a narcotics officer, and asked the defendant if he could speak to him. Defendant agreed and stepped off the line. Canale asked him where he was going, and he replied that he was going to Baltimore. When Canale asked him the reason for his trip, the defendant answered that he was going to visit family. Canale then asked the defendant if he could search his bag. The defendant said yes. The officer repeated the question and the defendant again said yes. According to Canale, the *188 defendant looked around rapidly during this conversation, speaking rapidly and in a broken voice. The officer opened the bag and inside a sneaker found a brown paper bag that contained a plastic bag of cocaine powder and another plastic bag containing 38 vials of cocaine.
The defendant was charged with criminal possession of a controlled substance in the second degree and criminally using drug paraphernalia in the second degree. The defendant moved to suppress the drugs on the ground that the search and seizure had been unlawful. A suppression hearing was held on June 12,1989, and the defendant’s motion was denied. The court found that Canale’s approach and questioning constituted a request for information and was permissible. The court further found that the defendant had consented to the search of his gym bag.
After his suppression motion was denied, the defendant pleaded guilty to criminal possession of a controlled substance in the third degree. He appealed to the Appellate Division, which affirmed his conviction, with one Justice dissenting. The Appellate Division agreed that Canale’s encounter with the defendant had been a request for information and not a common-law inquiry and that the defendant had consented to the search of his bag. The dissenting Justice, on the other hand, argued that Canale’s encounter with the defendant was a common-law inquiry that had to be supported by a founded suspicion that criminality was afoot, something that was lacking under the facts present in this case. The dissenter also argued that the result was inconsistent with prior decisions in People v Irizarry (168 AD2d 377, affd 79 NY2d 890 [decided today]) and Matter of Antoine W. (162 AD2d 121, affd 79 NY2d 888 [decided today]), in which the Appellate Division had labeled police-initiated encounters similar to the one at issue here common-law inquiries that had to be supported by a founded suspicion of criminality. The dissenting Justice at the Appellate Division granted defendant Saunders’ application for leave to appeal. People v Irizarry (supra) and Matter of Antoine W. (supra) have also been appealed to this Court.
III.
Since our decision in De Bour almost 16 years ago, courts have struggled over the difference between a request for information and a common-law inquiry. No doubt some of this confusion is attributable to the similarity between the two *189 terms. The Appellate Division in Matter of Antoine W. (supra) theorized that the De Bour request for information referred to "an 'informational’ approach to a citizen by the police (e.g., 'where’s the fire?’ or 'which way did he run?’ * * *)” (162 AD2d, at 122). This interpretation, however, misapprehends the facts in De Bour and ignores the case law that has issued from this Court in the years following De Bour.
In De Bour, we framed the issue as "whether or not a police officer, in the absence of any concrete indication of criminality, may approach a private citizen on the street for the purpose of requesting information” (People v De Bour, supra, at 213). In that case, two police officers walking their beat at 12:15 a.m. observed the defendant walking on the same side of the street in their direction. When the defendant came within 30 or 40 feet of the officers, he crossed the street. The officers followed him and asked him a series of questions.
We held that the approach and the questioning were permissible because they were supported by an articulable reason that justified the police action taken (id., at 213). We noted that police officers serve many different functions within society and that the rules governing encounters with civilians will to a large extent depend upon the police officer’s purpose in initiating the encounter. For instance, we stated that a police officer performing public service functions, not related to law enforcement, has wide latitude to approach people and ask for information (id., at 218). We cited as an example the right of a police officer to approach passersby in order to find the parent of a lost child. This public service approach for information is not the focus of De Bour, however, and to the extent that the Appellate Division suggested otherwise in Matter of Antoine W. (supra) this was clearly error.
Our holding in De Bour relates to police officers who are engaged in their criminal law enforcement capacity. We stated that "a policeman’s right to request information while discharging his law enforcement duties will hinge on the manner and intensity of the interference, the gravity of the crime involved and the circumstances attending the encounter” (id., at 219). We singled out the area of crime prevention for special mention, noting that "[s]ince this function is highly susceptible to subconstitutional abuses it will be subject to the greatest scrutiny” (id., at 220). Under the facts present in Be Bour, where the encounter was brief and lacking in harassment or intimidation, we concluded that the police approach *190 and subsequent questioning were reasonable and constituted a mere request for information (id., at 220).
An obvious starting point in our effort to clarify the difference between a request for information and a common-law inquiry is an examination of the type of questions asked in Be Bour. The officers asked the defendant what he was doing in the neighborhood and then asked for identification. These questions we permitted as part of a request for information. Thus, Be Bour suggests that even in their law enforcement capacity, police officers have fairly broad authority to approach individuals and ask questions relating to identity or destination, provided that the officers do not act on whim or caprice and have an articulable reason not necessarily related to criminality for making the approach (id., at 219). Be Bour also stands for the proposition that the brevity of the encounter and the absence of harassment or intimidation will be relevant in determining whether a police-initiated encounter is a mere request for information.
In later cases, we were sometimes less than precise in spelling out the difference between those questions that constituted a request for information and those that constituted a common-law inquiry. People v Moore (47 NY2d 911, revg for reasons stated in dissenting opn 62 AD2d 155), however, is more explicit. There, the police officers observed the defendant, who was bleeding and limping, carrying a pillowcase within which the officers could see the outline of a television set. This, according to the Appellate Division dissent upon which we rested our opinion, constituted an objective credible reason for making a request for information. The officers approached, asked the defendant where he was coming from and what was in the bag. We considered these questions to be a part of the request for information, and therefore reasonable. Only after being told that the pillowcase contained a television set and a fur coat did we consider the situation to have reached the level of a common-law inquiry (62 AD2d, at 159). Significantly, it was only at that point that the officer asked if he could look in the pillowcase (62 AD2d, at 159).
Our decision today is partially shaped by our own precedent and our commitment to deciding these cases in a manner that is consistent with Be Bour and its progeny. Be Bour itself suggests strongly that it is normally proper for a police officer, acting with the requisite level of suspicion, to approach an individual for information and as part of that encounter, ask *191 questions that relate to the person’s identity and reason for being in the area. This would include a request for identification.
Our holding in Moore represents the outer contours of what is permissible during a request for information. Although we permitted the officers in Moore to ask about the contents of a bag as part of a request for information, the facts in that case are unusual. There, the defendant was carrying a pillowcase through which a television set was visible. Moore certainly does not stand for the general proposition that it is always permissible for a police officer who approaches an individual for information to ask about the contents of a bag.
We recognize that the tone of police-initiated encounters with civilians can be subtle and ever-shifting, that words and gestures are susceptible to many varying interpretations, and that suspicion can grow based on intangibles evident only to the eyes of a trained police officer. Despite our sensitivity to the rapidity with which suspicion can escalate, however, we must place limits on the power of the police to pick out targets and subject them to invasive questioning based on nothing more than the objective and credible reason required for a request for information.
To that end, we emphasize that a request for information is a general, nonthreatening encounter in which an individual is approached for an articulable reason and asked briefly about his or her identity, destination, or reason for being in the area. If the individual is carrying something that would appear to a trained police officer to be unusual, the police officer can ask about that object. A pillowcase containing a television set is clearly unusual. A zippered blue bag carried by an individual about to board a bus is not.
Once the police officer’s questions become extended and accusatory and the officer’s inquiry focuses on the possible criminality of the person approached, this is not a simple request for information. Where the person approached from the content of the officer’s questions might reasonably believe that he or she is suspected of some wrongdoing, the officer is no longer merely asking for information. The encounter has become a common-law inquiry that must be supported by founded suspicion that criminality is afoot. No matter how calm the tone of narcotics officers may be, or how polite their phrasing, a request to search a bag is intrusive and intimidating and would cause reasonable people to believe that they *192 were suspected of criminal conduct. These factors take the encounter past a simple request for information.
We are well aware that this distinction is a subtle one. It is certainly unsettling to be approached by a police officer and asked for identification. Even though we term this a request for information, we do not mean to suggest that a reasonable person would not be taken aback by such a request. To some extent, then, our distinction rests on the content of the questions, the number of questions asked, and the degree to which the language and nature of the questions transform the encounter from a merely unsettling one to an intimidating one. We do not purport to set out a bright line test for distinguishing between a request for information and a common-law inquiry. These determinations can only be made on a case-by-case basis. In evaluating the propriety of police-initiated encounters, however, suppression courts should consider the factors we have identified above in determining whether a request for information or a common-law inquiry has occurred.
In People v Cantor (36 NY2d 106, 112), we recognized that "[s]treet encounters between the patrolman and the average citizen bring into play the most subtle aspects of our constitutional guarantees. While the police should be accorded great latitude in dealing with those situations with which they are confronted it should not be at the expense of our most cherished and fundamental rights.” We are well aware of the serious nature of the drug problem in this State. Undercover narcotics operations are an important component of the effort to stem the illicit flow of drugs into and out of the New York City area. We are also well aware that undercover officers develop a familiarity with their terrain and would likely be sensitive to behavior that a less-schooled onlooker would dismiss as trivial (see, People v Rosemond, 26 NY2d 101, 104). The four-tiered method for analyzing police encounters gives officers acting in their law enforcement capacity leeway in approaching individuals for information. It does not, however, permit police officers to ask intrusive, potentially incriminating questions unless they have founded suspicion that criminality is afoot.
Applying these principles to the cases now before us, we conclude that the police acted properly in their encounter with Hollman, but improperly as to Saunders.
When Officer Canale approached Hollman and his compan *193 ion, he had observed them standing 10 feet apart for several minutes with the orange bag between them. He had seen Hollman place the orange bag several seats in front of his own, and then saw him push his companion’s bag closer to his, again away from the seats he and his companion eventually took. These actions certainly gave rise to an objective credible reason, not necessarily indicative of criminality, for approaching the two men.
Canale then asked them if they were traveling together and where they were going. These questions are consistent with a request for information, and we consider them to be permissible under the circumstances. Next, the officer asked whether the two men had checked their luggage. We consider this to be permissible as well, although it clearly is more directed toward possible criminality than the earlier two questions. Given the officer’s observations, however, we believe that this question was part of a legitimate request for information.
When the two men denied that they had bags, this clearly aroused the officer’s suspicion, since he had observed them carrying the orange bag and the knapsack in the terminal and carefully place those bags away from their seats before sitting down. At that point, Canale had founded suspicion that criminality was afoot. He was now permitted to engage in the greater degree of intrusion inherent in the common-law inquiry. Canale next asked if they knew to whom the orange bag and black knapsack belonged. They said they did not. He then asked the other passengers if they knew who owned the bags. Only after everyone in the bus denied ownership of the bags did the officer open the bags and find the concealed drugs.
The Appellate Division concluded that Canale’s questions as to whether the two men were traveling together, as to their destinations, and as to their luggage constituted a request for information under the De Bour guidelines. We agree that the officer’s questions regarding travel plans, destination, and where they had placed their luggage were part of a request for information but find that the questions regarding the ownership of the bags were, given Canale’s knowledge, a proper exercise of the officer’s common-law right to inquire. Thus, there was no overbearing police pressure and the approach and ensuing questioning were in all respects proper. The Appellate Division’s finding of abandonment, a mixed question of law and fact, is otherwise supported by the record *194 and is therefore not subject to our further review (People v Harrison, 57 NY2d 470, 477; People v Hogya, 56 NY2d 602).
We reach a different conclusion, however, in the case of Gregory Saunders. In that case, the defendant caught Officer Canale’s attention because, according to Canale, he appeared nervous and repeatedly scanned the terminal. Canale testified at the suppression hearing that as the defendant’s attention was drawn into the boarding area, and when he and Canale made eye contact, he noticed Saunders hesitate.
To approach an individual for information, a police officer need only have an objective, articulable reason, as we have noted above. Here, Saunders’ behavior provided Canale with an objective reason for the approach. Similarly, the officer acted properly when he asked Saunders his destination. Again, this is the sort of question we have held in the past constitutes a request for information.
Canale crossed the line, however, when he asked to search the defendant’s bag. The defendant’s behavior, while it may have provided the officer with adequate basis for an approach and for a few general, nonaccusatory questions, was certainly not so suspicious as to warrant the further intrusion of a request to rummage through the defendant’s luggage. Because the defendant’s consent was a product of the improper police inquiry, the Appellate Division was in error when it found that the defendant had in fact consented to the search of his bag (see, People v Gonzalez, 39 NY2d 122, 128; see also, 3 LaFave, Search and Seizure § 8.2 [d] [2d ed]).
One last issue remains to be addressed. The People have asked us to overrule De Bour in light of a number of United States Supreme Court cases which have made it increasingly clear that police-initiated encounters falling short of actual seizures (see, Terry v Ohio, 392 US 1, 19, n 16) do not implicate the Fourth Amendment (see, e.g., Florida v Bostick, 501 US —, —, 111 S Ct 2382, 2386; Michigan v Chesternut, 486 US 567, 573-574; Immigration & Naturalization Serv. v Delgado, 466 US 210, 216-217; Florida v Royer, 460 US 491, 498 [White, J.]; see also, California v Hodari D., 499 US —, —, 111 S Ct 1547, 1550-1551).
At the time De Bour was decided, we noted that there was "scant appellate authority on this subject” (People v De Bour, supra, at 219). As the People accurately argue, this is no longer the case. In the years since De Bour became the law in New York State, the Supreme Court has held that approaches *195 which do not amount to seizures are not entitled to protection under the Fourth Amendment. The test, as stated recently by the Supreme Court, is whether "a reasonable person would feel free 'to disregard the police and go about his business’ ” (Florida v Bostick, 501 US, at —, supra, 111 S Ct, at 2386, quoting California v Hodari D., 499 US, at —, supra, 111 S Ct, at 1551). If the civilian would feel free to go, "the encounter is consensual and * * * will not trigger Fourth Amendment scrutiny unless it loses its consensual nature” (Florida v Bostick, 501 US, at —, supra, 111 S Ct, at 2386).
De Bour represents the culmination of a number of State common-law cases that provided a framework for the evaluation of police-civilian encounters (see, e.g., People v Cantor, supra; People v Ingle, 36 NY2d 413; People v Rosemond, supra; People v Rivera, 14 NY2d 441). In De Bour, constitutional law and common law both played a part in the articulation of the four-part test. Although we stated that "constitutional considerations do not disappear” when police encounters fall below the level of a seizure (People v De Bour, supra, at 217), we did not rest our analysis squarely upon the language of either the Federal or State Constitution. Rather, we noted that "[t]he basic purpose of the constitutional protections against unlawful searches and seizures is to safeguard the privacy and security of each and every person against all arbitrary intrusions by government. Therefore, any time an intrusion on the security and privacy of the individual is undertaken with intent to harass or is based upon mere whim, caprice or idle curiosity, the spirit of the Constitution has been violated” (id., at 217). To some extent, then, our holding in De Bour was not compelled by the specific language of either the State or the Federal Constitution. Rather, it reflected our judgment that encounters that fall short of Fourth Amendment seizures still implicate the privacy interests of all citizens and that the spirit underlying those words required the adoption of a State common-law method to protect the individual from arbitrary or intimidating police conduct.
The continued vitality of De Bour, therefore, is not contingent upon the interpretation that the Supreme Court gives the Fourth Amendment, because De Bour is largely based upon considerations of reasonableness and sound State policy. We still believe that police encounters that are not seizures or arrests for constitutional purposes should be evaluated under the De Bour test. The interests in privacy and security that led us to adopt that test as a matter of State *196 common law are no less vital today. Further, De Bour has been the law in this State for almost 20 years. Although we have seen fit to clarify it today, we see no reason to eliminate entirely its oversight of police encounters that fall below the level of a Fourth Amendment seizure. "[T]he aims of predictability and precision in judicial review of search and seizure cases and the protection of the individual rights of our citizens” (People v Johnson, 66 NY2d 398, 407) are best served by continuing to evaluate police-civilian encounters along the guidelines set forth in De Bour. Consequently, as a matter of State common law, we will continue to apply De Bour to assess the propriety of encounters that do not rise to the level of a seizure for purposes of the Fourth Amendment.
Accordingly, in the case of People v Hollman, the order of the Appellate Division should be affirmed. In the case of People v Saunders, the order of the Appellate Division should be reversed, defendant’s guilty plea vacated, his motion to suppress granted and the indictment dismissed.
Judges Simons, Kaye, Titone, Hancock, Jr., and Bellacosa concur; Judge Alexander taking no part.
In People v Hollman: Order affirmed.
In People v Saunders: Order reversed, guilty plea vacated, defendant’s motion to suppress granted and indictment dismissed.