(March 25, 1993)

■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v ROBERT OELLER, Appellant. [595 NYS2d 192] —Judgment of the Supreme Court, New York County (Nicholas Figueroa, J.), rendered August 9, 1990, after jury trial, convicting defendant of criminal possession of a controlled substance in the fifth degree, and sentencing him, as a predicate felony offender, to a term of two to four years, is affirmed.

While stopped at the corner of 119th Street and Second Avenue in Manhattan, at a red light, Officer John Brown and Officer Stephen Sanders observed defendant, a white male, pass an amount of money to an unapprehended black male and receive an "item" in exchange which he placed in his right hand coat pocket. Officer Brown testified that in four years of service, he personally had made up to 25 arrests and assisted in over 100 others at that location and that 90% of those arrests involved narcotics. The officers, believing they had witnessed yet another drug transaction, approached the two men for further inquiry, Officer Brown exiting the car and walking toward the men and Officer Sanders driving the car around the corner. As Officer Brown approached the men, the black male, who was facing in his direction, turned away as he saw Brown approaching while defendant turned around and faced Officer Brown. Fearing the defendant had a gun in his pocket, the officer ordered him to remove his hands from his pockets. When the defendant did so, he was holding several vials of cocaine in his right hand. Officer Sanders had approached at this time, noticed defendant's left hand in his coat pocket, and as a precautionary measure, since he was also fearful that defendant possessed a weapon, drew his gun and directed defendant to remove his hand from his pocket. Officer Brown arrested defendant and in a search thereafter found additional vials of cocaine in defendant's pocket.

Contrary to the position of the defendant, which the dissent adopts, the police had more than a "founded suspicion that criminal activity [was] afoot" (People v De Bour, 40 NY2d 210, 223). The police, in an area personally known to them as a high drug area, observed defendant give money in exchange for an "item". Thus, the police had a reasonable suspicion

that defendant had committed, was committing or was about to commit a crime and, therefore, they had the right to forcibly stop and detain him *(supra)*. In any event, even assuming, arguendo, that the police only had a common-law right of inquiry, upon their approach, the other participant in the drug transaction turned and left before the police could question either. This flight, whether at a walk or faster pace, only served to heighten the police suspicion. This, combined with the exchange of currency for an object "in an area rampant with narcotics activity", "negat[ed] all but the most implausible explanations for the transaction" *(People v McRay,* 51 NY2d 594, 604).

When the police approached to question defendant, they had the right *at the very least* to ask him to remove his hands from his coat pockets. As Officer Brown testified in response to defense questioning: "It is very common for people to carry guns in their coat pockets, especially when you are dealing with drugs. A lot of people enter drug transactions and are robbed subsequently. I don't want to take the chance of him having a gun in his pocket and taking it out and shooting myself and my partner or anybody else going by".

There was no frisk or search of defendant by the officer, but the intrusion was extremely minimal, a simple request to defendant to remove his hands from his pockets *(see, People v De Bour, supra,* at 221 [a simple request that De Bour open his jacket]). When, subsequently, the defendant removed his hand with vials of cocaine held in it, the police had probable cause to arrest him.

Finally, the suppression court did not find and the record does not show that either Officer Brown or Officer Sanders used "coercion or intimidation" in either the initial approach or during the unfolding scenario, as asserted by the dissent. While Officer Sanders did draw his weapon, he also did not seek to frisk or search defendant but repeated the admonition given by Officer Brown for defendant to take his hands out of his pockets. Neither officer asked the defendant to take any contraband out of his pocket. Both simply acted to insure their safety. "It would, indeed, be absurd to suggest that a police officer has to await the glint of steel before he can act to preserve his safety." *(People v Benjamin,* 51 NY2d 267, 271.) Such a minimal intrusion upon defendant's privacy "was devoid of harassment or intimidation" *(People v De Bour, supra,* at 220; *see also, People v Diaz,* 80 NY2d 950 [officer held his hand on holstered gun as he approached to request information]). Concur—Wallach, Ross and Asch, JJ.

Murphy, P. J., and Rubin, J., dissent in a memorandum by Rubin, J., as follows: At issue on this appeal is the propriety of police conduct in seizing defendant and illicit drugs found in defendant's possession. Whether the police officers acted reasonably or in violation of defendant's Fourth Amendment rights depends on whether the officers, one with gun drawn, were justified in directing defendant to remove his hand from his coat pocket.

Housing Authority Police Officer John Brown was on uniformed motor patrol with his partner, Officer Stephen Sanders, on the morning of October 15, 1989. At approximately 7:00 A.M., while their patrol car was stopped at a traffic light at the intersection of 119th Street and Second Avenue in the City and County of New York, Officer Brown saw what his training and experience led him to believe was a drug transaction. At the suppression hearing, he testified that the locale is regarded as a high drug-trafficking area and that he had personally made some 20 to 25 arrests for possession of illegal drugs in that vicinity.

The officers witnessed a brief conversation between defendant, a white male, and an unapprehended black male, during which defendant exchanged cash for an item which the officers could not identify and which, Officer Brown testified, defendant placed in his right-hand coat pocket. Officer Brown got out of the patrol car and walked towards the two men, approaching defendant from behind. His partner drove the patrol car around the corner, then he also approached the two suspects.

Officer Brown stated that the unidentified black male, who was facing defendant, turned and walked away at his approach while defendant turned towards him. As he did so, the officer saw that defendant had his right hand in his coat pocket, whereupon he directed defendant to remove his hand from the pocket. Officer Brown further testified that when defendant complied with his request he saw that defendant "had several vials of crack in his hand." On cross-examination, Officer Brown stated that he had observed no weapon in defendant's possession nor any bulge in his pocket. Defendant was not known to the officer, and no information was received that either defendant or the unapprehended party to the transaction was engaged in the sale of illegal drugs. Officer Brown testified that defendant was told to remove his hand from his pocket entirely for reasons of safety: "It is very common for people to carry guns in their coat pockets, especially when you are dealing with drugs."

His partner, Officer Sanders, testified that he was still in the patrol car as Officer Brown approached defendant: "As he exited the car, he ran around the back of the car as I moved it up." Officer Sanders then got out of the car and, according to his testimony, "I came between a car and a van on to the sidewalk and drew my weapon to protect my partner." At this time Officer Sanders was "approximately 15 feet" away from defendant and his "partner was just reaching Mr. Oeller." Both officers directed defendant to take his hand out of his pocket. According to Officer Sanders: "We said it virtually simultaneously, sir. I was walking towards Mr. Oeller at the time." On direct examination, Officer Sanders stated, "Officer Brown grabbed the subject. As I told him to come towards me and get his hand out of his pocket, he complied. I put him on the hood of the car and patted him down and searched for weapons." On cross-examination Officer Sanders stated he did not see anything in the hand defendant removed from his pocket "because at the time I was with Mr. Oeller we were pulling him towards the car to put him on the hood of the car to frisk him." The first time Officer Sanders saw any drugs was when, in the course of searching defendant, Officer Brown "reached into his pocket and pulled out a few extra vials."

Officer Brown placed defendant under arrest without reading him his *Miranda* rights. While defendant was being transported to the station house he made incriminating statements to the officers. The suppression court sustained the seizure of the drug vials and held that defendant's incriminating statements were voluntarily made.

Based upon the Court of Appeals' ruling in the leading decision of *People v De Bour* (40 NY2d 210), the conduct of the police officers in this case constitutes an impermissible intrusion upon the privacy and security of defendant *(People v Stewart,* 41 NY2d 65, 69-70), requiring exclusion of the evidence seized *(People v De Bour, supra,* at 217) and of defendant's subsequent statements *(People v Barreto,* 161 AD2d 305, 309, *lv denied* 76 NY2d 852). There is no doubt that the exchange of money for a small, unidentifiable item in an area known to the police for its high incidence of traffic in illegal narcotics is "sufficient to arouse the officers' interest" *(People v De Bour, supra,* at 220) and to justify "[t]he minimal intrusion of approaching to request information * * * when there is some objective credible reason for that interference not necessarily indicative of criminality" (40 NY2d, *supra,* at 223). Therefore, at least in its inception, the police action was justified and "reasonably related in scope to the circum-

stances" (40 NY2d, *supra*, at 215; *People v White*, 171 AD2d 607, *lv denied* 78 NY2d 976).

The People assert that "as Officer Brown approached, the man who had received money from the defendant turned and fled" which, they contend, obviated any "lingering theoretical possibility that the police might have misinterpreted the exchange between the two men." However, the allowable inference to be drawn from the flight of a suspect justifiably approached by police seeking information has been the source of controversy *(see, People v Howard,* 50 NY2d 583). Moreover, the testimony given at the suppression hearing indicates only that the unapprehended party to the transaction turned and walked away at the approach of Officer Brown. In any event, no testimony was adduced at the hearing to the effect that defendant fled at the officer's approach *(People v Leung,* 68 NY2d 734). Finally, the cases in which pursuit of a fleeing suspect in a drug transaction has been held reasonable involve the observed exchange of an identifiable package which, when taken together with the flight of a defendant at the approach of police officers, "establishes the necessary reasonable suspicion that defendant had committed, or was about to commit a crime, such that pursuit by the officers was justified" *(People v Leung, supra,* at 736).

Most significant in the case at bar is that, while the acts witnessed by the officers are sufficient to arouse interest and justify a request for information, they fall short of establishing the requisite reasonable suspicion that defendant had committed, or was about to commit, a crime so as to authorize a forcible stop and detention (CPL 140.50; *People v De Bour, supra,* at 223). Unlike *People v Leung (supra),* the officers did not see what was passed to defendant *(see also, People v Matienzo,* 81 NY2d 778 [small plastic bag], *affg* 184 AD2d 296; *People v McRay,* 51 NY2d 594 [glassine envelope]). Therefore, the authority to frisk upon suspicion that a detainee is armed, which is the corollary of the statutory right to detain for questioning (CPL 140.50), is not implicated *(People v De Bour, supra,* at 223).

Nor can it be said that the approach of a police officer, with gun drawn, constitutes an encounter "devoid of harassment or intimidation" (40 NY2d, *supra,* at 220). The circumstances of this case are clearly sufficient to transform defendant's encounter with the police officers "from a merely unsettling one to an intimidating one" *(People v Hollman,* 79 NY2d 181, 192) so as to remove it from the category of a request for information. Unquestionably, had the police officers merely asked

defendant to remove his hand from his pocket, without the use of coercion or intimidation, the scenario would not be distinguishable from the facts of *People v De Bour (supra),* and the resultant seizure of the contraband would be deemed reasonable. Even assuming, for the sake of argument, that the exchange of money for an unknown object in a high drug-trafficking area is sufficient to entertain "a founded suspicion that criminal activity is afoot" so as to invoke the common-law right of inquiry *(People v De Bour, supra,* at 223), the degree of interference authorized is still "short of a forcible seizure" *(supra,* at 223), represented here by defendant's detention at gunpoint. *People v Fernandez* (182 AD2d 431, *lv denied* 79 NY2d 1049), relied upon by the People, is distinguishable. In that case, not only did police officers witness an exchange, disguised as a handshake, but also received an in-person report by a passer-by that drugs were being sold at the particular location, supporting a reasonable suspicion that the defendant was involved in criminal activity and providing justification for the forcible stop and detention of the suspect. Here, the police were in possession of no information regarding the nature of defendant's activities.

In the absence of sufficient indicia of criminality, the force employed by the police officers in confronting defendant, however "prudent" the People argue it to be under the circumstances, cannot be a predicate to a lawful arrest and seizure. Reasonable suspicion that defendant committed a crime is necessary to sustain a seizure pursuant to the statutory right to stop and search any person for weapons (CPL 140.50; *People v De Bour, supra,* at 223). The presence of defendant's hand in his pocket is not, in itself, an inherently hostile or threatening gesture and, even considering the attendant circumstances, is at best equivocal. Significantly, the testimony of the arresting officer was not to the effect that defendant reached into his pocket but that, upon turning around, his hand was observed to be *in* the pocket *(compare, People v Diaz,* 181 AD2d 597, *lv granted* 79 NY2d 1009). This could hardly have been surprising as Officer Brown testified, on cross examination, that the hand defendant had in his pocket was the same hand, the right hand, which he used to place the item received in the transaction into his coat pocket. It is well settled that behavior susceptible to both innocent and culpable interpretation does not constitute probable cause to believe a crime has been committed or even reasonable suspicion that a person is about to commit a crime, and justifies neither his actual nor constructive restraint *(People v De Bour, supra,* at 216).

Accordingly, the seizure of the contraband and defendant's subsequent incriminating statements should have been suppressed.