(July 20, 1995)

■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v HAROLD VASQUEZ, Appellant. [629 NYS2d 756] —Judgment, Su-

preme Court, New York County (Jeffrey Atlas, J.), rendered August 13, 1992, convicting defendant, upon his plea of guilty, of criminal possession of a controlled substance in the fifth degree, and sentencing him, as a second felony offender, to a term of 3 to 6 years, affirmed.

The officers testified at the *Mapp/Huntley* hearing that upon entering the lobby of a public housing apartment building at 5:00 A.M., they observed defendant appear nervous and step backwards with widened eyes at their presence; and, in response to their inquiry as to whether he lived in the building, defendant said that he did not and then spontaneously turned and placed himself up against the wall, keeping his left hand open and his right hand conspicuously closed in a fist; and, upon the officers asking defendant what was in his hand, he responded by opening his hand and revealing a vial of crack cocaine. This testimony was not incredible as a matter of law (*People v Garafolo*, 44 AD2d 86, 88), so as to warrant disturbing the hearing court's determination of credibility, which must be accorded "much weight" (*People v Prochilo*, 41 NY2d 759, 761).

The dissent correctly states that deference to the hearing court "does not require slavish adherence to findings at variance with common sense and common knowledge". However, the facts herein are distinguishable from the cases cited by the dissent. In *People v Garafolo* (*supra*, at 89), the Second Department found incredible the testimony of a State investigator that he observed the lack of a tax stamp on a pack of cigarettes *inside* a *carton* which, itself, was *inside* a *brown paper bag* containing another four or five cartons, lying horizontally in the bag "so stamps on individual packs would scarcely have been observable". *People v Miret-Gonzalez* (159 AD2d 647, *lv denied* 76 NY2d 739), also decided in the Second Department, involved an officer who stopped defendant for speeding and a defective brake light. *After* finding the car was not stolen, the officer launched into an investigation of the car including the tire tread and paint neither of which was the predicate for the stop. He testified he could see inside a toy box on the front seat and that it contained a white chunky substance. However, the officer was impeached with his own incident report prepared by him the day of the arrest in which he said he took up the box and looked inside *before* seeing the white substance. Finally, in *Matter of Carl W.* (174 AD2d 678, 680), the Second Department found incredible, testimony that the young appellant had said " '[l]et's get out of here' " to a fully secured arrestee lying handcuffed face down on the sidewalk, since it

"called for the performance of an act by the arrestee which was physically impossible under the circumstances presented".

Contrary to the impression created by the dissent that the suppression court attempted to posit some rational explanation for a " 'painfully' " improbable scenario, that court's reasoning showed its decision denying suppression was not "at variance with common sense and common knowledge". Thus the court said, in part:

"I credit the testimony of the police officers in this case. That may seem odd to the defense counsel who considered that that testimony was painfully incredible, but I don't consider it painfully incredible. Indeed, the District Attorney is right, one measures—there are many measures one applies to the testimony of the witness, not the least of which is the demeanor and appearance on the witness stand, the manner in which the person testifies, the inherent likelihood or unlikelihood of what the story is is certainly a factor to be considered and the probability or improbability of what the witness says, but I, sitting as a judge, for a very long time, and I have seen a lot of police officers who have searched people and forced people to do lots of things that are in violation of their constitution, even unlawful and even in many, many—I have seen many, many situations where the Defendants themselves have done a lot of very surprising things.

"I don't find the testimony of the police officers in this case particularly shocking, deliberately the way it was told to me, the testimony of both officers, it seems to me it's not improbable, that is to say, when measured by my experience it's not impossible to have occurred."

The court found that defendant, who by his own admission had made a drug buy a few minutes before he entered the lobby, was alarmed by "their presence at that hour in the morning". He was holding a crack vial in his hand and had 51 more vials on his person. Obviously, he was shaken by the sudden appearance of the police. When asked by them if he lived in that building, defendant's action in turning to the wall and assuming the frisk position while unusual was not incredible under the circumstances. This is especially true where defendant, a predicate felon, stated that he had three children and needed money to support them and, as noted by the hearing court, was "seeking a break", i.e., his freedom. Certainly, his cooperation was entirely explicable given these circumstances.

Nor do we find that the officers' conduct constituted a common law inquiry that lacked a founded suspicion that criminal activity was afoot. The officers had an objective credible basis

under the circumstances to approach and request information, and their brief and nonthreatening inquiry as to whether defendant lived in the building, and what he had in his hand, was justified, and did not elevate the encounter to an accusatory level (*People v Hollman*, 79 NY2d 181). Accordingly, the hearing court properly denied suppression of the narcotics and spontaneous statements uttered by defendant after his arrest. Concur—Rosenberger, Ross, Asch and Nardelli, JJ.

Murphy, P. J., dissents in a memorandum as follows: After the denial of his suppression motion, defendant pleaded guilty to criminal possession of a controlled substance in the fifth degree.

At the suppression hearing two Housing Authority police officers testified as to the events leading up to and attending the discovery of some 52 vials of cocaine on the defendant's person. According to the officers, they encountered defendant in the lobby of 60 East 106th Street, a Housing Authority building, at about 5:00 A.M. on March 1, 1992. On seeing the officers enter the lobby, defendant reportedly seemed surprised. When asked by the officers whether he lived in the building he replied "no" and then, without any prompting, immediately turned and placed his hands against the wall as if to invite a search of his person. Observing that one of defendant's now prominently displayed hands was closed into a fist, the officers, assertedly for their safety, requested that defendant open his fist. He did so, disclosing one vial of cocaine. He was then placed under arrest and asked whether he had "anything else". He is said to have replied, "Officer, I'm going to be honest, I have drugs", and thereafter to have obligingly turned over to the officers a bag containing 51 vials of cocaine which had been tucked into the small of his back. Once he had handed over the incriminating evidence, the defendant, who had two prior felony convictions and was still on parole, is reported to have spontaneously stated, "Please Officer, give me a break. I have three daughters. I can't go back in. I just needed the money."

The defendant testified to a very different version of relevant events. He stated that before going to 60 East 106th Street he had purchased 50 vials of cocaine and that the seller had made a gift of two additional vials which he placed in his right front pocket. Just after the purchase, defendant met an acquaintance who told him that she had just seen his friend, Mario, walking towards 60 East 106th Street where he lived. Defendant went to the building hoping to catch up with Mario. When he did not see Mario in the lobby, he entered the stairwell intending to climb the stairs to Mario's fifth-floor apartment.

Before ascending, however, defendant heard a "rumbling" coming from the basement which sounded as if "somebody tripped over something or else a fight". Momentarily, he saw two police officers enter the stairwell and run up the stairs toward him. When they reached him, they escorted him to the lobby where they ordered him and three other persons who had just entered the lobby to "get up against the wall". Defendant complied with the order as did one of the three more recent lobby entrants. The remaining two entrants, however, attempted to leave and eventually complied only after one of the officers placed his hand on his revolver and threatened to "put a bullet in [their] back" if they did not do as they were told. All of the detainees were then searched. The officer searching defendant asked him whether he would find anything, to which defendant replied that he did not have a weapon. The officer then asked defendant whether he would "find anything else" and defendant responded, "Yes, you will find my crack". By the time of defendant's response, however, the officer had already lifted up defendant's trenchcoat to reveal the bag of drugs in his waistband. Two additional vials of cocaine were recovered from the defendant's right front pocket.

From the foregoing it would appear that the prosecution was contending, in reliance upon the police witnesses, that the defendant, upon being encountered by two police officers in the public lobby of an apartment building and asked what all concerned agree was an entirely innocuous informational question, turned and without further ado placed his hands, one of which contained a vial of cocaine, against the wall in a gesture interpretable only as a consent to a search of his person. To be absolutely clear, it is contended that the defendant acted in this fashion even though he did not have to and indeed had not been requested to, and that he did so notwithstanding his possession of some 52 vials of recently acquired cocaine which, although secreted in his hand and about his waist, would certainly have been detected in the course of the search to which he had apparently assented. The motion court was of the view that this version of events, although "odd", was not "painfully incredible" or "particularly shocking", and apparently on the dubious strength of this lukewarm assessment of the police officers' credibility went on to deny the suppression motion. Evidently attempting to posit some rational explanation for the distinctly, if not "painfully", improbable scenario to which the police had testified, the court hazarded that perhaps the defendant in consenting to be searched believed the cocaine would go undetected or that if it was detected he might, given his cooperative attitude, be able to strike a deal with the officers.

In the context of a challenge to the constitutionality of police conduct leading to the seizure of physical evidence, it is, of course, the People who must go forward with evidence establishing in the first instance that the cited conduct was legal (*People v Berrios*, 28 NY2d 361, 367, citing *People v Malinsky*, 15 NY2d 86, 91, n 2). To the extent that this initial showing necessitates reliance on the testimony of police witnesses, that testimony must be credible if the People's burden is to be met (*supra*, at 369). While the findings of the hearing court, particularly as they concern witness credibility, are entitled to great weight on appeal, it is at the same time a unique and indispensable responsibility of an intermediate appellate court to review the hearing record and, when it is manifestly appropriate, in "a careful exercise of [its] jurisdiction * * * effectively curtail * * * alleged abuses" (*supra*, at 369). Deference to the findings of the hearing court then goes only so far and does not require slavish adherence to findings at variance with common sense and common knowledge (*People v Garafolo*, 44 AD2d 86, 88; *People v Miret-Gonzalez*, 159 AD2d 647, 649, *lv denied* 76 NY2d 739; *Matter of Carl W.*, 174 AD2d 678, 679). Accordingly, at our level of review, removed though it may be from the actual audition of testimony, it is nevertheless " '[t]he rule * * * that testimony which is incredible and unbelievable, that is, impossible of belief because it is manifestly untrue, physically impossible, contrary to experience, or self-contradictory, is to be disregarded as being without evidentiary value, even though it is not contradicted by other testimony or evidence introduced in the case' " (*People v Garafolo, supra*, at 88, quoting 22 NY Jur, Evidence, § 649; *see also, Matter of Carl W., supra; People v Miret-Gonzalez, supra*).

Respectfully, it would seem to me that the police testimony relied upon by the motion court falls well within the afore-described category. What the officers said occurred in this case simply does not consist with common sense much less with what is commonly known of the behavior of experienced felons intent on avoiding reapprehension and further penal sanction. It is practically inconceivable that anyone, let alone a seasoned offender on parole, would gratuitously volunteer to be searched by the police knowing as did the present defendant that he or she was in possession of over 50 vials of easily discoverable cocaine. Indeed, it is nothing if not fanciful to suppose as did the motion court that the defendant would have thought that, in the event of a search, the discovery of the more than 50 vials of cocaine he had stuffed into his waistband could have been avoided or that his facilitation of the search would or could render its obvious outcome in any measure benign. There

is, when all is said and done, no rational or experientially true explanation for the drug laden defendant's allegedly spontaneous surrender to the police, and in the absence of any such explanation I believe that reason dictates the rejection of the testimony in which so distinctly improbable a scenario was placed before the court. This was testimony in the end most readily explicable not as a representation of actual events but as a means of nullifying the defendant's constitutional objections.

Accordingly, the motion to suppress should have been granted, and the indictment dismissed.