(April 30, 2015)

■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v LATIFF THOMPSON, Appellant. [8 NYS3d 185]—

Judgment, Supreme Court, New York County (Edward J. McLaughlin, J., at suppression hearing, jury trial and sentencing), rendered May 23, 2012, convicting defendant of criminal possession of a weapon in the second degree (two counts) and criminal possession of stolen property in the fourth degree, and

sentencing him, as a second violent felony offender, to an aggregate term of 12 years, unanimously reversed, on the law, the motion to suppress granted, and the indictment dismissed.

In response to defendant's motion to suppress a gun and the credit card belonging to the complainant, a hearing was held at which Police Officers Kahla Cadore and Siwy Made testified that on August 22, 2011, they, along with Officer Gene Park, were on uniform foot patrol in their assigned area, which extended from East 112th to East 115th Street, and from First Avenue to Madison Avenue. At around 11:25 p.m., the officers heard a radio report that a gunpoint robbery had just occurred at 77 East 115th Street.

According to Made, the report described the robbers as three black men around 20 years old. All of the men were reported to be wearing shorts, one was said to have on a white "wifebeater" vest or tank top, another a polo shirt, and the third man's shirt was not described. According to Cadore, based on memo book entries she recorded hours after the arrest, the radio run described three black men, about 5'7" tall, 20 years old, one wearing a white vest or tank top and khaki shorts, a second wearing a red polo shirt and khaki pants, and the third a buttoned-down, black and white T-shirt. The report also stated that the men were running from the Taft Housing Project toward the Johnson Housing Project.

While the officers searched the area, about 10 minutes later, they received a second radio report of a "suspicious male" in front of 1581 Park Avenue, in the Johnson Housing Project, two blocks from the location of the robbery. The officers went to that address, and saw a man entering the building using a key, which they did not find to be suspicious. About a minute later, however, they saw defendant and three young black men emerge from 1581 Park Avenue. According to Made, one man wore a white "wifebeater" tank top, one a blue polo shirt, and the third man wore shorts. Made testified that defendant fit the radioed description because he was young, black, and wore a tank top. Cadore testified that the four men were black and in their early 20's. Two of them wore "wifebeaters with shorts," one wore a red polo shirt, and defendant wore a black and white checkered shirt. According to Cadore, the men were all approximately 5'7". Defendant's pedigree information later showed that he was 5'8" tall.

Made directed the four men to stop and stand against a fence in front of 1581 Park Avenue, and he then asked them for identification. A few seconds later, Made radioed that he had stopped four men. Immediately after that, one man fled, and

Officer Park chased him. The officers then frisked the remaining men. Made did a "quick pat" of defendant's sides and another man, while Cadore frisked the third man; neither officer found anything.

The officers then waited with the men for the complainant to arrive for a showup. After approximately five or six minutes had passed, Made noticed defendant "going to his waistband, inside his back" with his right hand, as though he were "throwing drugs or something." At around the same time, Cadore saw a bulge in defendant's waistband, under his shirt, in front of his pants, and saw defendant make "movements toward his back and toward his waist area." Made then lifted defendant's shirt to reveal a gun in his waistband. The officers arrested defendant. Several minutes later, other officers arrived. One of them searched defendant and recovered a credit card bearing the name of the complainant.

The court denied defendant's motion to suppress the gun as the product of an illegal search and the credit card as the fruit of a consequently illegal arrest. The court acknowledged that the 911 caller's descriptions of the robbers' clothing did not comport with what the individuals who were stopped were wearing, but speculated that the men might have changed clothes in the building. Regardless, the court concluded, the men could be subject to a level one inquiry under *People v De Bour* (40 NY2d 210 [1976]) because they emerged from a building located in the direction where the robbers were reported to have been running, and it was reasonable for the police officers to ask them whether they had seen anything suspicious. According to the court, the situation changed when one of the men took flight, which gave the officers the reasonable suspicion necessary to detain the remaining men. Further, the officers were entitled to determine why defendant was making certain hand movements near his waistline.

Defendant effectively concedes that the sequence of events leading up to the emergence of the four men from the building at 1581 Park Avenue justified a level one *De Bour* request for information. We agree, if only because the group of men was in a location to which a group of robbers had been reported to have fled only minutes earlier, giving the officers an articulable reason for inquiring into why the men were in the area (*see People v Hollman*, 79 NY2d 181, 191 [1992]). The question, then, is whether the encounter ever escalated to a point that the police would have been justified in holding the men at the scene while the complainant was transported to it.

As noted, reasonable suspicion is a necessary predicate to a

detention for a showup identification (*see People v Williams*, 87 AD3d 938 [1st Dept 2011], *lv denied* 18 NY3d 863 [2011]). Further, a person's flight is sufficient to create the reasonable suspicion necessary to escalate a level one or level two encounter to a level three detention, so long as other circumstances are attendant, such as a high-crime location and activity suggesting, although not alone creating, reasonable suspicion that the person fleeing the scene may be engaged in criminal conduct (*see People v Martinez*, 80 NY2d 444, 448 [1992]). In all of the cases which discuss flight as the determining factor in creating reasonable suspicion, however, the defendant is the person who fled. Here, of course, defendant did not flee; he obeyed the officers' direction to stop and to submit to their questioning. The People contend that this is irrelevant, because the consciousness of guilt demonstrated by the person who ran was imputed to the group as a whole.

We reject this approach, which the People fail to support with even a single case citation. The flight of one member of a group is hardly indicative of the collective guilt of the group. It is just as readily demonstrative of the innocence of those who remain at the scene. More importantly, it would be manifestly unfair to place an individual's right to be left alone in the hands of another person over whom he has no control, and who may not even be known to that person (*see People v St. Clair*, 80 AD2d 691 [3d Dept 1981], *affd* 54 NY2d 900 [1981]).

In any event, the other man's flight, even if it could in theory be imputed to defendant and the others in the group, was insufficient to raise the encounter to one based on reasonable suspicion that a crime had been committed. That is because the attendant circumstances were not otherwise suggestive of criminal activity. As the suppression court observed, the clothing worn by the men in the group did not match the clothing described to the officers in the radio run. Further, there was nothing unique about four men walking together late on a summer evening, and the fact that they left a building which was located in the housing project to which the radio run had reported the robbers were running was not strongly indicative that this was the same group (*compare People v Michimani*, 115 AD3d 528 [1st Dept 2014], *lv denied* 23 NY3d 1040 [2014] [defendant's flight was sufficient to raise level of suspicion and justify pursuit where he was with a group of eight men, the size of the group matched the description of a "shots fired" radio transmission, as did their physical descriptions, and the location where the police encountered them was "(i)n very close temporal and spatial proximity to the transmissions and the specific location"]).

Since the police officers did not have the reasonable suspicion necessary to detain the men, and should have let them know they were free to leave once they had gathered the basic information permissible in a level one stop, the officers should never have had the opportunity to notice the bulge in defendant's waistline that they missed when they performed their initial search. Nor can the lifting of defendant's shirt and seizure of the gun be justified as having been in the interests of the officers' safety, since there was no testimony that the officers believed defendant to be carrying a weapon (*see People v Alozo*, 180 AD2d 584 [1st Dept 1992]). To the contrary, Officer Made seemed to think that the gestures defendant was making had to do with an effort to hide drugs.

Because the seizure of the weapon was illegal, so too was the arrest of defendant for possessing it. Accordingly, the credit card should have been suppressed as the fruit of an unlawful arrest (*see People v Powell*, 242 AD2d 500 [1st Dept 1997]). Concur—Mazzarelli, J.P., Sweeny, Renwick, Feinman and Kapnick, JJ.