Rivera, J.
(dissenting). According to the undisputed facts, police officers entered a building, saw defendant standing in the lobby, immediately approached and stopped him, and asked what he was doing in the building. Based on his initial response, police continued questioning defendant and, upon finding his answers unsatisfactory, arrested him. He now challenges the officers’ initial approach and request for information as a violation of his right to be free from unwarranted police intrusions.
On the strength of our precedent, I disagree with the majority’s conclusion that the police may approach and request information from a person, who the police fail to observe doing anything other than standing still, simply because the area where the police find the person is the lobby of a building with an alleged history of criminal trespass activity. This conclusion is not supported by De Bour and its progeny, and compromises *145 the privacy interests that first motivated this Court to adopt the four-tiered analytic framework for evaluating police-initiated encounters (see People v Hollman, 79 NY2d 181, 195 [1992]; People v De Bour, 40 NY2d 210 [1976]). Therefore, I dissent.
As in all cases implicating the De Bour analysis, our review of the issues must begin with an understanding that the holding in De Bour
“reflected our judgment that encounters that fall short of Fourth Amendment seizures still implicate the privacy interests of all [persons] and that the spirit underlying th[e] words [of the State or Federal Constitution] required the adoption of a State common-law method to protect the individual from arbitrary or intimidating police conduct” (Hollman, 79 NY2d at 195).
The approach in De Bour balances the rights of the individual to be free from investigative confrontations and the authority of the police to approach individuals in furtherance of their law enforcement function (40 NY2d at 219), and “is largely based upon considerations of reasonableness and sound State policy” (Hollman, 79 NY2d at 195).
As now well-established, De Bour provides “a four-tiered method for evaluating the propriety of encounters initiated by police officers in their criminal law enforcement capacity” (Hollman, 79 NY2d at 184). “Each progressive level . . . authorizes a separate degree of police interference with the liberty of the person approached and consequently requires escalating suspicion on the part of the investigating officer” {id. at 185). As relevant to the issues raised in this appeal, “a police officer, acting with the requisite level of suspicion, [who] approach [es] an individual for information” may request identification and ask “questions that relate to the person’s identity and reason for being in the area” (id. at 190-191; see De Bour 40 NY2d at 220). This type of police encounter, referred to as a level one or tier one intrusion, constitutes an interference with the individual’s liberty, and therefore must be justified by “an objective credible reason[,] not necessarily indicative of criminality” (Hollman, 79 NY2d at 185; De Bour, 40 NY2d at 223).
To ensure against arbitrary conduct, an officer’s actions cannot have resulted from “mere whim, caprice or idle curiosity” (De Bour, 40 NY2d at 217; Hollman, 79 NY2d at 190; see also People v McIntosh, 96 NY2d 521, 525 [2001]). Instead, the legal *146 ity of an encounter under our De Bour jurisprudence depends on “whether a nexus to [defendant’s] conduct existed, that is, whether the police were aware of or observed conduct which provided a particularized reason to request information” (McIntosh, 96 NY2d at 527). The fact that the encounter occurs in an area with a reputation for criminal activity, alone, cannot provide the requisite justification for even “basic, nonthreatening questions regarding . . . identity, address or destination” (Hollman, 79 NY2d at 185; see also McIntosh, 96 NY2d at 527 [“fact that an encounter occurred in a high crime vicinity, without more,” fails to pass scrutiny under De Bour and Hollman], citing People v Holmes, 81 NY2d 1056, 1058 [1993]).
A court’s determination of the outer contours of a level one police encounter is further informed by this Court’s recognition of two limitations on police officers’ authority to approach and ask questions. First, is the Hollman Court’s instruction that “[t]he four-tiered method for analyzing police encounters gives officers acting in their law enforcement capacity leeway in approaching individuals for information. It does not, however, permit police officers to ask intrusive, potentially incriminating questions unless they have founded suspicion that criminality is afoot” (79 NY2d at 192). Second, is the well-established constitutional right of individuals “ ‘to be let alone’ and to refuse to respond to police inquiry” (People v May, 81 NY2d 725, 728 [1992], citing People v Howard, 50 NY2d 583, 590 [1980]). As the Court has explained, “while the police [have] the right to make the inquiry, defendant ha[s] a constitutional right not to respond” (Howard, 50 NY2d at 590; Davis v Mississippi, 394 US 721, 727 n 6 [1969]).
Here, the officers immediately approached defendant upon entering the lobby, after traveling directly from the building’s entrance. They had no prior information that defendant was trespassing or involved in some other illegal activity, which might justify a request for information {see McIntosh, 96 NY2d at 527 [officer might be justified under De Bour level one to request information based on a tip or other information about illegal activity in the area, including information that a fugitive or suspect had been reported in a specific area]). There were no “attendant circumstances . . . sufficient to arouse the officers’ interest” of the type recognized in De Bour, and our subsequent cases {see De Bour, 40 NY2d at 220 [where officers observed De Bour “cross( ) the street to avoid walking past” them, in a drug activity prone area]; Hollman, 79 NY2d at 193 *147 [officer observed Hollman move his and a companion’s bags several times after boarding a bus]; McIntosh, 96 NY2d at 527 [investigator observed defendant, seated in the back of the bus, pushing a black object between himself and a companion]). Nor did the officers personally observe conduct by defendant that would provide an objective, credible, particularized reason to request information, such as defendant walking around the lobby with no apparent purpose, or standing idle for a lengthy period of time, both of which would suggest he was neither tenant nor guest. Nor did the officers find defendant uncertain about the location of the elevator or staircase, or other common areas of the building, which are known to tenants and the building’s employees, again providing an objective basis to inquire as to why he was in the lobby. Instead, the only information the officers had about the defendant was that he was standing in the lobby of a building, which was alleged by the landlord to have been the site of prior criminal trespass. However, under our law, even a minimal intrusion of defendant’s liberty requires that the police officers have an objective credible reason that is not based solely on the alleged criminal activity of defendant’s location (McIntosh, 96 NY2d at 527).
Nevertheless, the majority concludes that the police encounter here is not based solely on the alleged criminal activity in the building because defendant’s presence in a trespass affidavit program (TAP)-enrolled building was coupled “with the private and protected nature of that location” (majority op at 144). I disagree with what is essentially the majority’s “presence plus TAP” justification for a level one police intrusion, because the basis for TAP enrollment is the building’s alleged history of criminal activity. A building participating in TAP is nothing other than an alleged “high crime vicinity,” which, in turn, is the same proposed additional factor this Court explicitly rejected in McIntosh as insufficient to justify a request for information.
Of course, a location’s reputation for criminal activity may be a factor, along with other information, that provides an officer with the credible objective reason to request information (see McIntosh, 96 NY2d at 526-527). Still, criminal activity cannot be coupled, as the majority concludes here, with such benign conduct as standing still. While the requisite objective credible reason need not indicate criminality (see De Bour, 40 NY2d at 223), it must, at least, suggest a reason to ask an individual for their identifying information (see McIntosh, 96 *148 NY2d at 527 [request for information justified only if “a nexus to (defendant’s) conduct existed”]).
There is no way of escaping the simple truth that under the majority’s approach police officers are free to inquire of those who are not trespassers, such as tenants and their guests, on the assumption that they are breaking the law by their mere presence in a TAP-enrolled building. That type of over inclusive policing cannot be squared with our requirement that a nexus to the conduct exist, that is to say that the police must have a particularized reason to request information, based on the awareness of information or the observation of conduct (see id. at 527). It also ignores the “considerations of reasonableness and sound State policy” (Hollman, 79 NY2d at 195), namely, the privacy interests of all persons, and our commitment to the “protection of] the individual from arbitrary or intimidating police conduct” that provide “continued vitality” to the De Bour analytic framework (id.; see De Bour, 40 NY2d at 218-220).
The majority seeks to rationalize its holding, and the impact of its decision on TAP-enrolled building residents and their guests, by its assertions that “the police patrol at issue here was intended in part to combat trespassing,” and that a police officer could have identified a trespasser only by requesting information (majority op at 144). The argument that routine police encounters, like the one at issue here, are necessary to facilitate law enforcement plainly ignores the De Bour Court’s warning that “the area of crime prevention” “is highly susceptible to subconstitutional abuses” (40 NY2d at 220). Indeed, the Court saw fit to “subject [this function] to the greatest scrutiny; for whereas a [police officer’s] badge may well be a symbol of the community’s trust, it should never be considered a license to oppress” (id. at 220; see also id. at 220 n 2 [noting that certain law enforcement techniques used “to create an atmosphere of security .... may infringe on the privacy and freedom of individuals”]). The majority’s sanction of the blanket intrusion on the liberty of all persons encountered in a building, including those wholly innocent of any criminal activity, cannot meet such heightened review.
With respect to the contention that police can only determine whether someone is a trespasser by approaching and requesting information from an individual who is standing in a private area of a building, the same could be said of other crimes where a person could be standing in plain sight and be in violation of the law, such as, for example, crimes of possession (see Penal *149 Law § 265.02 [criminal possession of a weapon in the third degree]; Penal Law § 220.16 [criminal possession of a controlled substance in the third degree]). The majority’s analysis thus results in the evisceration of level one of the De Bour framework as applied to other categories of crimes, not just trespassing.
Even if this were not the case, there are no facts in the record here, or case law, in support of the majority’s premise. All that occurred here is that the officers entered the building and immediately approached the defendant and started asking him questions. However, where an officer or third party’s safety is not implicated, an officer can become aware of information about a person that provides an articulable reason to initiate an encounter: a “nexus to conduct” (McIntosh, 96 NY2d at 527). Based on that nexus, the officer is justified in requesting information, as well as “in keeping defendant under observation” (Howard, 50 NY2d at 590).
Nevertheless, permitting an officer to request information from someone standing in a TAP-enrolled building would be problematic for another reason: the officer is not assured of a truthful answer. Based on the individual’s response, the officer will either accept it as true, which may not be the case, or continue to ask questions, presumably because the officer suspects the person is not answering truthfully and is indeed trespassing. This very scenario reveals the fundamental problem with the majority’s analysis. That is to say, that the initial police encounter, in practice, will, by necessity, escalate beyond a level one request for information. As this Court has explained, “[o]nce the officer asks more pointed questions that would lead the person approached reasonably to believe that [the person] is suspected of some wrongdoing and is the focus of the officer’s investigation, the officer is no longer merely seeking information” (Hollman, 79 NY2d at 185). Rather than preserve the integrity of the De Bour analytic framework, this potential for the escalation of police encounters undermines the “continued vitality” of that analysis.
No less so because the request for information involved in this case is not a “general, nonthreatening encounter in which an individual is approached for an articulable reason and asked briefly about his or her identity, destination, or reason for being in the area” (id. at 191). Instead, it is a request for information that by its nature serves to incriminate, or potentially increase an officer’s suspicion of criminal activity.
*150 Along these same lines of concern, the majority fails to address what happens if the person approached refuses to answer, and remains silent, or says, “I do not have to talk to you.” Or, what if the individual simply walks away? Given that an individual in a police-initiated encounter may seek to exercise that person’s “right to be let alone” (People v Moore, 6 NY3d 496, 500 [2006]), and this Court’s previous statements that an individual need not talk to an officer and may walk away from the police in a noncustodial encounter (see Howard, 50 NY2d at 590-591; May, 81 NY2d at 728; People v Holmes, 81 NY2d 1056, 1058 [1993]; Moore, 6 NY3d at 500), the potential for escalation seems all too likely.
The majority fails to consider what this Court clearly recognized in De Bour, namely that police encounters are fraught with tension. Even a level one encounter can cause anxiety. For, “[fit is certainly unsettling to be approached by a police officer and asked for identification. Even though [the Court] term[ed] this a request for information, [it] d[id] not mean to suggest that a reasonable person would not be taken aback by such a request” (Hollman, 79 NY2d at 192). Accordingly, we have developed legal rules sensitive to the reality “that the tone of police-initiated encounters with civilians can be subtle and ever-shifting, that words and gestures are susceptible to many varying interpretations, and that suspicion can grow based on intangibles evident only to the eyes of a trained police officer” {id. at 191).
As a final matter, although not specifically addressed by the majority, one of the People’s arguments warrants consideration, given that the argument relies on general notions of fairness and just treatment under the law. The People argue that residents of buildings in high-crime areas “are entitled ... to feel safe in their homes” and “should not have to contend with intruders simply because they do not have a doorman, security guard, or other building employee to restrict access.” Certainly our law ensures that persons unable to afford the private security available to those with greater financial means are nonetheless guaranteed the full protection of our laws, regardless of their economic status. That is, of course, the promise of our legal system: all are equal under the law. However, TAP enrollment of a building known for criminal activity does not ensure for its residents an equal footing with persons living, visiting, or working in buildings with private security personnel. The experiences of these two groups during encounters *151 with the “security force” in their respective buildings are not similar. In a TAP-enrolled building the police do not know the tenants — otherwise they would have no reason to request information of those they encounter during their routine vertical sweeps. In contrast, in a building with private security personnel, the tenants, and often their guests, are known to the building employees and thus can avoid the indignity of being assumed to be trespassers. Moreover, in a building with private security personnel, it may be possible for the tenants to influence the application of security protocols, and choose how they want their building protected. Here, there is nothing to suggest that the tenants participated in deciding to enroll in TAP. Given these differences, tenants in TAP-enrolled buildings are not assured equal treatment by stripping them of their rights to be free from police encounters that fail to meet minimal standards.
Judges Pigott, Abdus-Salaam and Stein concur; Judge Rivera dissents in an opinion in which Chief Judge Lippman concurs.
Order, insofar as appealed from, affirmed.