THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
DOUGLAS BOYD, Appellant.

First Department, February 25, 1993

## APPEARANCES OF COUNSEL

*Kerry Elgarten* of counsel *(Philip L. Weinstein,* attorney), for appellant.

*David C. Zuckerbrot* of counsel *(Gregory H. Mansfield* with him on the brief; *Robert M. Morgenthau, District Attorney* of New York County, attorney), for respondent.

## OPINION OF THE COURT

Asch, J.

Officers of various police departments and agencies in New York were working in Penn Station on an interdepartmental "drug interdiction" team when defendant Boyd was observed, searched and arrested. Officer Coiro, an Amtrak Police Investigator, observed defendant, a black male, on August 15, 1989, carrying a large grey suitcase, in the main concourse of the station near the Amtrak ticket windows. Defendant was sweating profusely, and according to Officer Coiro, was "very surveillance conscious", pacing back and forth, constantly looking over his shoulder "like he was looking for someone". The defendant went to the telephone area about 10 feet away from the ticket windows, "dialed a number and started talking". Officer Coiro, who had made eye contact with the defendant at one point, before the "defendant looked away very quickly", followed the defendant to the telephone area and picked up the receiver next to defendant feigning a call in an attempt to overhear defendant's conversation. The officer testified that the phone slipped out of defendant's hands, and that he heard a steady busy signal, but that, nevertheless, the defendant picked up the phone and continued to speak. After defendant "said, 'good-bye', hung up the phone and started to walk away", Officer Coiro and New York State Police Investigator Marc Pouch approached him. Officer Coiro identified himself and asked defendant where he was going. "He stated he was going to Trenton. I asked him if he had a train ticket.

He produced a New Jersey Transit ticket to Trenton. I looked at it, gave it back to him, and I asked him where he lives. He stated to me that he lived in New York and that he was going to go to Trenton. At this point in time, I asked him who he was talking to on the phone. He stated, I was talking to my sister. I said, well, I was on the phone next to you when you dropped the receiver. I said, you weren't talking to anybody. He said, I was talking to my girlfriend. I said, you just told me you were talking to your sister. He said, no, my girlfriend. I said, where are you going. He said, I'm going home to Trenton. I said, well, sir, you just told me you live in New York. He said, I live in both places. With that, I explained what we do, being a narcotics officer with Amtrak, and asked him permission to look in his bag. With that, he became very, very nervous, and he said, go ahead. I knealt [sic] down and went to unzip the suitcase, and there was a padlock on it. I asked him if he had a key. He said, no, it's my sister's bag. She let me use it. I said, if she let you use it, how did you get your clothes in it. I said, do you have a key with you. He said, no. He said, it is my sister's bag. I'm trying it [sic] home to her. With that Officer Dominance asked Mr. Peele, the name he was using, if it would be okay to pick the lock. He said, if you can do it, go for it. Officer Dominance took out a pick and picked a lock and I said, if we can get it open, can we look. Mr. Peele said, yes. I unzipped the suitcase and laid it out and picked it up. With that, I observed some rags and some clothing. Moving that aside, I found the narcotics, and he was then placed under arrest."

The grey suitcase was not produced at the hearing, since Officer Pouch "didn't take the trouble to voucher that suitcase" and he had no idea where it could be located at that date.

The Supreme Court denied the motion to suppress. We find that on the facts before us, that denial was erroneous and therefore reverse and dismiss the indictment.

It is clear from the testimony of Officer Coiro that, before this police-citizen encounter, the police "drug interdiction" team had a policy, learned in a "Drug Interdiction School", of looking for individuals who met a certain profile. Defendant, carrying a grey suitcase, who was "sweating profusely" and "pacing back and forth" and "surveillance conscious", met this profile. However, each of his actions were susceptible of an innocent explanation. The defendant was in a train terminal and certainly carrying a suitcase there was not out of

place. Despite the fact there was testimony the station was air conditioned, it was the middle of August, and the fact defendant was perspiring was not abnormal. Pacing and looking about are likewise usual in Penn Station where many people meet, wait for trains and may be apprehensive about the safety of their possessions and persons. Making fleeting eye contact with a stranger who is just standing looking at you, and then quickly looking away, is not only normal, but may even be considered a "survival tactic" in New York City. These factors, either alone or cumulatively, could not suffice to give the officers herein, a "founded suspicion that criminal activity [was] afoot" *(People v De Bour,* 40 NY2d 210, 223).

Defendant's conduct in supposedly making a sham telephone call pretending to be speaking while the receiver was emitting a busy signal also did not succeed in giving rise to such a "founded suspicion". The hearing court noted: "I didn't like the way Coiro testified. He was glib, evasive. He was too smooth * * * and if I were relying on him, the People would lose." While the court stated it was Pouch's testimony that enabled the People to meet their "heavy burden", Pouch did not testify at all about the alleged phone call. Since the testimony of Coiro about the "charade on the telephone" (so termed by the suppression court), was unsupported by Pouch, we find that, while the hearing court's findings as to Coiro's credibility were correct, its ultimate conclusion was erroneous.

Thus, even assuming, arguendo, that the remainder of the testimony was credible, when the officers went to question the defendant, they had, at most, only articulable reasons, not necessarily indicative of criminality, which would justify no more than the minimal intrusion of approaching to request information *(People v De Bour, supra,* at 223). Significantly, after the officers identified themselves and Officer Coiro asked where defendant was going, defendant told him "Trenton", and then when asked if defendant had a ticket, the defendant showed the officer a train ticket to Trenton.

We have given much of the testimony at the suppression hearing in an attempt to duplicate the intimidating and accusatory nature of the encounter. The police are, of course, entitled to "request information", but they cannot "bootstrap" themselves into the next degree of intrusion, i.e., the common-law right to inquire, which is activated by a founded suspicion that criminal activity is afoot, by the type of unwarranted, aggressive questioning which took place here. A request for information must be made in a general, nonthreat-

ening manner and the individual asked briefly about his identity, destination and reason for being in the area *(see, People v Hollman,* 79 NY2d 181, 191). Once, however, the "questions become extended and accusatory and the officer's inquiry focuses on the possible criminality of the person approached, this is not a simple request for information * * * The encounter has become a common-law inquiry that must be supported by founded suspicion that criminality is afoot" *(supra,* at 191).

In the matter before us, there was no predicate for the second stage of police intrusion and the request to search the defendant's bag was, therefore, improper. "The police officer's observations of the defendant in this case provided him with an 'objective credible reason' to approach the defendant and ask him questions about his destination and identity *(see, People v Hollman,* 79 NY2d 181 [decided today]; *People v De Bour,* 40 NY2d 210, 223). The police officer's request to search the defendant's bag was improper, however, because it was not based on a 'founded suspicion that criminal activity [was] afoot' *(People v Hollman, supra,* at 191; *People v De Bour, supra,* at 223). Because the defendant's consent was a product of the improper police inquiry, the trial court erred when it found that the defendant had consented to the search of his bag *(see, People v Hollman, supra,* at 194)." *(People v Irizarry,* 79 NY2d 890, 892.)

Accordingly, the judgment of the Supreme Court, New York County (Edward McLaughlin, J., at hearing and plea; Edwin Torres, J., at sentence), rendered February 7, 1990, which convicted defendant, upon his plea of guilty, of criminal possession of a controlled substance in the third degree, and sentenced him, as a second felony offender, to a term of 4½ to 9 years, should be reversed, on the law and facts, and the indictment dismissed. The matter is remitted to the trial court for the purpose of entering an order in favor of the accused pursuant to CPL 160.50, not less than 30 days after service of this order upon the respondent, with leave during this 30-day period to respondent to move and seek any further stay of the implementation of CPL 160.50 as in the interest of justice is required.

MURPHY, P. J., CARRO, ROSENBERGER and ROSS, JJ., concur.

Judgment of the Supreme Court, New York County, rendered February 7, 1990, is reversed, on the law and facts, and the indictment dismissed. The matter is remitted to the trial

court for the purpose of entering an order in favor of the accused pursuant to CPL 160.50, not less than 30 days after service of this order upon the respondent, with leave during this 30-day period to respondent to move and seek any further stay of the implementation of CPL 160.50 as in the interest of justice is required.