[726 NYS2d 625]

THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v OTIS PEART, Respondent.

THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v MICHAEL CHANG, Respondent.

First Department, May 31, 2001

## APPEARANCES OF COUNSEL

*Stanley R. Kaplan* of counsel (*Joseph N. Ferdenzi* on the brief; *Robert T. Johnson, District Attorney* of Bronx County, attorney), for appellant.

*Timothy W. Lewis* for Otis Peart, respondent.

*David J. Goldstein* of counsel (*Goldstein, Weinstein & Fuld,* attorneys), for Michael Chang, respondent.

## OPINION OF THE COURT

Tom, J.

This case arises from a police stop in the Bronx of a car that lacked license plates. Defendant Chang was the driver and defendant Peart was the passenger.

At the suppression hearing, John Quinn, an 8½-year veteran of the New York City Police Department, testified about the events leading up to the stop and the subsequent recovery of drugs. On November 3, 1997, at about 12:35 A.M., Officer Quinn was on a plainclothes assignment in an unmarked vehicle with Police Officer Tirado when he saw a recent model Lexus without license plates heading in his direction on Westchester Avenue. The officers turned around and followed the vehicle, at which point the vehicle turned off of Westchester Avenue, after which the officers activated the red dome light on their dashboard. The officers exited their own car and approached the Lexus. Quinn observed that the car had tinted windows and that the windows were up. When Quinn reached the rear of the Lexus, he saw what appeared to be a "transit plate" in the rear passenger window, but also noticed that it had no serial number or state stamp and that it appeared to be only a photocopy. Quinn, who had received training in false documentation, concluded that it was a false license plate. On cross-examination, he explained that an "in transit plate" is issued by a state when the purchaser resides in one state but purchases the car in a different state, and serves as temporary authorization to drive the vehicle until the owner can register it.

As Quinn shone a light in the car from the passenger side, he saw the defendant Peart, who was the passenger, "make a dipping motion to the front toward [the] ground." On cross, he indicated that he had been looking at the transit plate when the passenger's movement caught his eye. When Quinn took a step closer to the door, he saw Peart look over his right shoulder and then make the same dipping motion again. With his

gun still holstered, Quinn, who wore a shield around his neck, knocked on the window and indicated that Peart should roll the window down. Peart did not respond. At that point, Quinn tried the door handle, which opened, and Quinn identified himself as a police officer. Quinn told Peart that he seemed to be moving around excessively and asked him if, in order to make the officers "a little more comfortable * * * why he was moving towards the floor board of the car. What had he put down on the floor of the car?" Quinn explained that "because of the furtive movement I felt my safety was threatened" by the possibility that a weapon had been placed there. At this point, Quinn observed a shoe box on the floor between Peart's feet. Peart responded that the box contained just shoes and Quinn said "well if it's just shoes maybe you can show me and maybe we can get a little more secure and he said no problem." Peart opened the shoe box and pulled out an Uncle Ben's Rice bag. Quinn's gun remained holstered during this entire time period. Peart then said, "oh, it's just rice." Quinn shone his light on the bag and observed that, to the contrary, it contained a white powdery substance which, from his training, he believed to be a controlled substance. When Quinn asked Peart why there was powder in the rice bag, he looked at it and said "oh, it's just flour." At this point, Quinn asked Peart to place the bag on the floor and to step out of the vehicle. Quinn, by use of a code word, then alerted Tirado, who was standing by the driver's door, of the presence of drugs. Tirado then removed Chang from the car. When other officers arrived, Quinn removed the rice bag from the container on the floor. He found two bags of heroin within the rice bag, a spoon and foil.

Quinn testified that for a car being driven without documentation, the standard procedure, without regard to the subsequent events of this evening, would have been for the officer to arrest the driver and arrange for seizure of the vehicle, followed by an inventory search. Quinn did subsequently determine that Chang owned the vehicle.

The motion court fully credited Officer Quinn's testimony, crediting also his explanation that his questioning was motivated by the genuine fear that a gun might be involved. The court found the stop to have been proper, a point upon which we all agree (see, e.g., People v Duncan, 234 AD2d 8), and that the officer under these circumstances had the right to request information from defendants relating to the reason for the stop. The court also found Officer Quinn's conduct to have been restrained and measured, and his questions regarding

the contents of the box and the request to see the contents to have been non-coercive and proper from a Fourth Amendment perspective.

However, analyzing the officer's conduct under New York constitutional law and our common-law privacy concerns under the *Hollman* (*People v Hollman*, 79 NY2d 181, 194) doctrine, the court concluded that the officer's questions were accusatory and intruded impermissibly beyond a request for information. The court's analytical model was whether the officer's inquiry was properly predicated on a founded suspicion of criminality and concluded that defendant's conduct was clearly susceptible of an innocent explanation. Finding the predicate for the questioning insufficient, the court suppressed. In so doing, though, the court also noted that if the questioning had passed muster under *Hollman*, then defendant's patently false answers, coupled with the officer's observations, would have supported the requisite founded suspicion of criminality permitting further inquiry. The core of the suppression ruling, though, was that the circumstances of the stop, even considering defendant's ducking motion, did not objectively support a conclusion that the box contained a gun. Our review of the record leads us to disagree as a matter of law. Therefore, we reverse.

Aspects of the motion court's decision are internally inconsistent. The court credited Quinn's conclusion that a gun might be in the box. Though not made explicit in the decision, it necessary follows that Quinn had an objective, more than a mere subjective, basis to believe that his life would be placed in danger. The officer's testimony, fairly read, would support such an objective conclusion of potential imminent peril. An apparently undocumented late model luxury car was properly stopped for questioning in the early morning hours (approximately 12:35 A.M.) in the vicinity of the Cross Bronx Expressway, a common route of fast ingress and egress from the Bronx and, as the officer approached the window, the passenger quickly ducked, repeatedly, toward the floor of the front seat, then apparently declined to respond when the officer tried to conduct an inquiry, and eventually responded by acquiescing in the officer's suggestion regarding decreasing any potential volatility of a highly uncertain situation. This is the core point, since even the suppression court recognized that defendant's subsequent conduct would have opened the door, so to speak, to further police intrusiveness. Inherent in the court's findings is that this was not a pretext stop, and that the

car was apparently driven illegally. Absent proper documentation, defendants would be removed and the car impounded, so that the incident was not amenable to resolution by the officers simply going away. That being the case, at some point, Quinn had to assure himself of his own safety, a credible fear as even acknowledged by the motion court. As was stated by the Court of Appeals in *People v Allen* (73 NY2d 378, 380), an officer under these circumstances need not "await the glint of steel" before taking reasonable measures for his or her own safety (citation omitted). Explicit in the court's findings was its adoption of Quinn's testimony. Hence, this is not *Hollman*, which arose from encounters, not tinged with safety concerns, between citizens and drug interdiction units in bus stations.

As noted above, the stop was proper (*People v Duncan, supra; People v Desir*, 138 AD2d 236). We agree with the court that there is no indication of any pretext stop or intention to conduct a drug interdiction (*cf., People v Fields*, 257 AD2d 387; *cf., People v Boyd*, 188 AD2d 239). Omitted from the motion court's reasoning, though, was that possession of forged transit plates itself would have been a crime (Penal Law §§ 170.25, 170.10; *People v Hodges*, 246 AD2d 824), and that the officers could likely suspect that the car had been stolen (*People v Vasquez*, 106 AD2d 327, *affd* 66 NY2d 968; *compare, People v Concepcion*, 216 AD2d 141, *lv denied* 86 NY2d 792 [mere fidgeting by defendant without any indicia of criminality]; *People v Chism*, 194 AD2d 351 [defendant and others merely sitting in parked car looking in vicinity of store provided only a predicate for inquiry]). Extant in Quinn's testimony was the imminence of an arrest and seizure of the automobile on this basis. Subsequently obtained information rebutting the initial reasonable suspicion of criminality does not alter the propriety of the stop and related actions (*People v Garner*, 196 AD2d 727). Quinn's use of the flashlight and observations of what lay on the floor then were, of course, appropriate (*Vasquez, supra; Desir, supra*).

When there is a lawful stop of a vehicle, courts have recognized furtive motions toward the floor to be a reasonable basis for an officer to believe that a weapon may be involved (*People v Jones*, 248 AD2d 328, *lv denied* 92 NY2d 854; *People v Alston*, 195 AD2d 396; *People v Rodriquez*, 160 AD2d 960; *People v Jean-Louis*, 154 AD2d 393; *People v McClane*, 143 AD2d 848), a concern arguably heightened in this case by Peart's initial apparent non-response. The test is the reasonableness and restraint of the intrusiveness when measured by the legitimate danger.

Hence, where, as here, a passenger during the early morning hours in a vehicle without license plates, apparently alarmed at the officer's presence, tries to quickly place something on the floor in response to the officer's approach, that furtiveness is a reasonable basis for the officer to take the next logical, limited, step to ascertain the absence of any threat to his safety (*Jean-Louis, supra; McClane, supra; Rodriquez, supra*), circumscribed, of course, by those areas in which a weapon might be hidden (*McClane, supra*). Again, we find no basis to dispute the motion court's characterization of Quinn's actions as measured and restrained and, in fact, his attention was directed only to the box on the floor within defendant's easy reach.

The requisite need for protective measures correlates with the defendant's possible access to the weapon, so that cases diverge depending on whether the defendant remains in the car in proximity to the suspicious object, or is removed from the car (*compare, People v Jackson*, 79 NY2d 907 [defendant remained in car], *with People v Torres*, 74 NY2d 224 [defendant removed from car]), as we have noted elsewhere (*Alston, supra*). It bears repeating that neither defendant was removed from the car, no gun was drawn, and no provocative action was taken by the justifiably concerned officer other than merely asking for an assurance that the box that appeared to have been the object of Peart's concealment did not itself conceal a gun. The motion court characterized Quinn's verbal exchange in this regard as accusatory, a characterization that is not, I believe, borne out by the record (*cf., People v Boyd, supra*). Quinn's limited interest was to seek some manifestation of assurance, at most "rather cursory" (*see, e.g., Alston, supra*), that the box did not conceal a gun, an assurance that defendant, notably, did not seem disinclined to provide (*see, e.g., People v Battaglia*, 86 NY2d 755, *affg* 206 AD2d 916).

Hence, the order of the Supreme Court, Bronx County (Peter Benitez, J.), entered June 8, 1999, granting defendants' consolidated motions to suppress physical evidence, should be reversed, on the law, the motions denied, and the matters remanded for further proceedings.

NARDELLI, J. P., MAZZARELLI, ELLERIN and RUBIN, JJ., concur.

Order, Supreme Court, Bronx County, entered June 8, 1999, reversed, on the law, defendants' consolidated motions to suppress physical evidence denied, and the matters remanded for further proceedings.