This opinion is uncorrected and subject to revision before publication in the New York Reports.
--------------------------------------------------------------

No. 123
The People &c.,
            Respondent,
        v.
Anthony Barksdale,
            Appellant.

Jan Hoth, for appellant.
Sheila L. Bautista, for respondent.
New York Civil Liberties Union et al., amicis curiae.

FAHEY, J.:

On this appeal we consider the admissibility of evidence seized following defendant's arrest in the lobby of an apartment building in Manhattan that was enrolled in the trespass affidavit program (TAP). Under the particular facts and

- 1 -

circumstances of this case we conclude that the record supports the lower courts' determinations that the police had an objective credible reason to approach and request information from defendant, and thus to begin the encounter that culminated in his arrest and the seizure of the disputed evidence.

Defendant pleaded guilty to three counts of criminal possession of a weapon in the third degree, but on this appeal he challenges only one of those charges, which is based on the discovery of a razor blade on defendant's person following his arrest for criminal trespass in the third degree on April 21, 2009. Defendant sought suppression of the razor blade on the ground "that he was unlawfully stopped and arrested,"[1] and at the ensuing hearing the People presented the testimony of a police officer who participated in the seizure of that weapon.

On the date in question, the police officer was directed to conduct a foot patrol in a Manhattan neighborhood

---

[1]     That request arguably implicates one of the higher levels of the multi-tiered framework for evaluating police-initiated encounters with private citizens, including those that occur in residential apartment buildings (see People v Roque, 99 NY2d 50, 52 [2002]), that this Court established in People v De Bour (40 NY2d 210, 223 [1976]) and People v Hollman (79 NY2d 181, 184-185 [1992]). But heretofore defendant has not approached this suppression question as implicating anything other than a level one De Bour inquiry, and we thus do not consider his belated request at oral argument to apply a different level of that framework (see generally People v Lovett, 25 NY3d 1088, 1091 [2015]). Nor do we have any cause to address the propriety of either of the police officers' hypothetical actions in the event defendant had refused to respond to his inquiry, as defendant advances no arguments in that respect.

and, in furtherance of that assignment, he looked into buildings for the purpose of locating either trespassers or those committing other crimes.  The officer targeted buildings enrolled in the TAP, which he characterized as a form of solicitation of police assistance for structures that are prone to trespassers.[2] The officer stated that buildings included in the TAP have signs denoting their enrollment, and that trespassers are subject to arrest.  While on his foot patrol the officer observed such a sign at an apartment building on West 129th Street, and he and

---

[2]    This Court has similarly described the TAP:

"Often a building owner or manager files a 'trespass affidavit' with police stating that the building has been plagued by illegal drug trade and asks police to patrol the building for trespassers.  Police then stop people they encounter in the halls to ask for identification and to inquire if they are residents or otherwise lawfully in the building" (Roque, 99 NY2d at 52).

We note, however, that Roque's description of the TAP is not perfectly applicable here because the materials before us reflect that the New York County District Attorney's Office, not the New York City Police Department (NYPD), controls the enrollment of buildings in the TAP in Manhattan.  That distinction is arguably material to this matter given the reference by amici including the New York Civil Liberties Union to discovery in Ligon v City of New York (925 F Supp 2d 478 [SD NY 2013]), a class action brought against the City of New York and the NYPD challenging "stops made by the police on suspicion of trespass outside of certain privately-owned buildings in the Bronx" (id. at 483). Based on Ligon, the amici contend that the order appealed from "rests on the faulty assumption that enrollment in the [TAP] signifies that a building is the site of criminal activity."  We do not, however, credit that point here inasmuch as the materials before us reflect that the TAP is administered differently in Manhattan than it is in New York City's other boroughs.

his police partner entered that building apparently for the purpose of conducting a "vertical patrol," that is, a sweep of each floor of the building.

When they entered the building, the officers saw defendant standing in its lobby. Within a few minutes they asked defendant "what he was doing [there]." Defendant responded that he was visiting a friend but, upon further questioning, defendant acknowledged both that he could not identify that friend and that he did not live in the building. The officers then arrested defendant, whereupon the testifying officer's police partner frisked defendant and found a razor blade in one of his pants pockets. Although there was no private security guard in front of the building, the testifying officer recalled that the door to the building had a lock on it, and that he saw a sign indicating that the building was enrolled in the TAP when he entered that structure.

The hearing court denied suppression of the razor blade, concluding that "[b]ecause the building [was] part of the [TAP, the testifying officer] had an objective credible reason to ask defendant why he was there," and defendant subsequently pleaded guilty to, inter alia, the relevant count of criminal possession of a weapon in the third degree. On appeal, the Appellate Division affirmed, writing that the testifying officer's observation of "defendant standing in the lobby of a [TAP] building . . . gave [him] an 'objective credible reason' to

ask defendant whether he lived there, which constituted a level one request for information" under this Court's longstanding metric for evaluating police-initiated encounters with civilians (110 AD3d 498, 498 [1st Dept 2013], quoting Hollman, 79 NY2d at 190).  The Appellate Division further concluded that the testifying officer's "inquiry was not based merely on the reputation of the area, but also on the fact[s] that the building was so prone to trespassing that the landlord had request[ed] police assistance in removing intruders[,] . . . that defendant was in a plainly nonpublic lobby of a posted trespass affidavit building, and that the officer was aware of this at the time he made his inquiry" (110 AD3d at 498-499 [internal quotation marks omitted]).  A Judge of this Court granted defendant leave to appeal (23 NY3d 1034 [2014]).

Our analysis begins with the points "that whether police conduct in any particular case conforms to De Bour is a mixed question of law and fact," and that, in such circumstances, "our review is limited to whether there is evidence in the record supporting the lower courts' determinations" (People v McIntosh, 96 NY2d 521, 524 [2001]).  On the merits, our analysis proceeds under the first of the four levels of De Bour, which sets a low bar for an initial encounter: it "permits a police officer to request information from an individual and merely requires that the request be supported by an objective, credible reason, not necessarily indicative of criminality" (People v Moore, 6 NY3d

496, 498 [2006]; see De Bour, 40 NY2d at 223).

Here the record reflects that the encounter occurred in a private space restricted by signage and a lock, and that police assistance in combating trespassing had been sought through enrollment in the TAP. Put simply, the coupling of defendant's presence in the subject building with the private and protected nature of that location supports the intrusion giving rise to what became the seizure in question. We conclude that there is record support for the determination that the police had an objective credible reason to request information from defendant (see generally People v Hendricks, 43 AD3d 361, 362-363 [1st Dept 2007]; People v Tinort, 272 AD2d 206, 206-207 [1st Dept 2000], lv denied 95 NY2d 872).[3]

In so concluding we note that the police patrol at issue here was intended in part to combat trespassing, that is, "knowingly enter[ing] or remain[ing] unlawfully in or upon a premises" (Penal Law § 140.05), that the building at issue was enrolled in the TAP for the purpose of addressing that problem, and that this branch of the TAP is rooted in tenant protection

---

[3]    Our decision herein does not conflict with McIntosh (96 NY2d 521), which teaches that geography alone, that is, *mere presence* in a high crime location, does not provide a predicate for even a level one De Bour inquiry (see id. at 526-527). The intrusion here was borne of more than simply presence in a high-crime neighborhood, inasmuch as it was based on defendant's presence in a private area of a building, to which access was restricted by signage and a lock, and which was enrolled in the TAP.

throughout Manhattan.  Under these circumstances a police officer could have identified a trespasser only by requesting information.

Accordingly, the order of the Appellate Division, insofar as appealed from, should be affirmed.

People v Anthony Barksdale

No. 123

RIVERA, J.(dissenting):

According to the undisputed facts, police officers entered a building, saw defendant standing in the lobby, immediately approached and stopped him, and asked what he was doing in the building. Based on his initial response, police continued questioning defendant and, upon finding his answers unsatisfactory, arrested him. He now challenges the officers' initial approach and request for information as a violation of his right to be free from unwarranted police intrusions.

On the strength of our precedent, I disagree with the majority's conclusion that the police may approach and request information from a person, who the police fail to observe doing anything other than standing still, simply because the area where the police find the person is the lobby of a building with an alleged history of criminal trespass activity. This conclusion is not supported by De Bour and its progeny, and compromises the privacy interests that first motivated this Court to adopt the four-tiered analytic framework for evaluating police-initiated encounters (see People v Hollman, 79 NY2d 181, 195 [1992]; People v De Bour, 40 NY2d 210 [1976]). Therefore, I dissent.

As in all cases implicating the De Bour analysis, our

- 1 -

review of the issues must begin with an understanding that the holding in De Bour "reflected our judgment that encounters that fall short of Fourth Amendment seizures still implicate the privacy interests of all [persons] and that the spirit underlying th[e] words of the [State or Federal Constitution] required the adoption of a State common-law method to protect the individual from arbitrary or intimidating police conduct" (Hollman, 79 NY2d at 195).  The approach in De Bour balances the rights of the individual to be free from investigative confrontations and the authority of the police to approach individuals in furtherance of their law enforcement function (40 NY2d at 219), and "is largely based upon considerations of reasonableness and sound State policy" (Hollman, 79 NY2d at 195).

As now well-established, De Bour provides "a four-tiered method for evaluating the propriety of encounters initiated by police officers in their criminal law enforcement capacity" (Hollman, 79 NY2d at 184).  "Each progressive level . . . authorizes a separate degree of police interference with the liberty of the person approached and consequently requires escalating suspicion on the part of the investigating officer" (id. at 185).  As relevant to the issues raised in this appeal, "a police officer, acting with the requisite level of suspicion, [who] approach[es] an individual for information" may request identification and ask "questions that relate to the person's identity and reason for being in the area" (id. at 190-91; see De

Bour 40 NY2d at 220).  This type of police encounter, referred to as a level one or tier one intrusion, constitutes an interference with the individual's liberty, and therefore must be justified by "an objective credible reason[,] not necessarily indicative of criminality" (Hollman, 79 NY2d at 185; De Bour, 40 NY2d at 223).

To ensure against arbitrary conduct, an officer's actions cannot have resulted from "mere whim, caprice or idle curiosity" (De Bour, 40 NY2d at 217; Hollman, 79 NY2d at 190; see also People v McIntosh, 96 NY2d 521, 525 [2001]).  Instead, the legality of an encounter under our De Bour jurisprudence depends on "whether a nexus to [defendant's] conduct existed, that is, whether the police were aware of or observed conduct which provided a particularized reason to request information" (McIntosh, 96 NY2d at 527).  The fact that the encounter occurs in an area with a reputation for criminal activity, alone, cannot provide the requisite justification for even "basic, nonthreatening questions regarding . . . identity, address or destination" (Hollman, 79 NY2d at 185; see also McIntosh, 96 NY2d at 527, citing People v Holmes, 81 NY2d 1056, 1058 [1993] ["fact that an encounter occurred in a high crime vicinity, without more," fails to pass scrutiny under De Bour and Hollman]).

A court's determination of the outer contours of a level one police encounter is further informed by this Court's recognition of two limitations on police officers' authority to approach and ask questions.  First, is the Hollman Court's

instruction that "[t]he four-tiered method for analyzing police encounters gives officers acting in their law enforcement capacity leeway in approaching individuals for information.  It does not, however, permit police officers to ask intrusive, potentially incriminating questions unless they have a founded suspicion that criminality is afoot" (79 NY2d at 192).  Second, is the well-established constitutional right of individuals "'to be let alone' and to refuse to respond to police inquiry" (People v May, 81 NY2d 725, 728 [1992], citing People v Howard, 50 NY2d 583, 590 [1980]).  As the Court has explained, "while the police [have] the right to make the inquiry, defendant ha[s] a constitutional right not to respond" (Howard, 50 NY2d at 590; Davis v Mississippi, 394 US 721, 727 n6 [1969]).

Here, the officers immediately approached defendant upon entering the lobby, after traveling directly from the building's entrance.  They had no prior information that defendant was trespassing or involved in some other illegal activity, which might justify a request for information (see McIntosh, 96 NY2d at 527 [officer might be justified under De Bour level-one to request information based on a tip or other information about illegal activity in the area, including information that a fugitive or suspect had been reported in a specific area]).  There were no "attendant circumstances . . . sufficient to arouse the officers' interest" of the type recognized in De Bour, and our subsequent cases (see De Bour, 40

NY2d at 220 [where officers observed De Bour "cross[] the street to avoid walking past" them, in a drug activity prone area]; Hollman, 79 NY2d at 193 [officer observed Hollman move his and a companion's bags several times after boarding a bus]; McIntosh, 96 NY2d at 527 [investigator observed defendant, seated in the back of the bus, pushing a black object between himself and a companion]).  Nor did the officers personally observe conduct by defendant that would provide an objective credible, particularized reason to request information, such as defendant walking around the lobby with no apparent purpose, or standing idle for a lengthy period of time, both of which would suggest he was neither tenant nor guest.  Nor did the officers find defendant uncertain about the location of the elevator or stair case, or other common areas of the building, which are known to tenants and the building's employees, again providing an objective basis to inquire as to why he was in the lobby.  Instead, the only information the officers had about the defendant was that he was standing in the lobby of a building, which was alleged by the landlord to have been the site of prior criminal trespass.  However, under our law, even a minimal intrusion of defendant's liberty requires that the police officers have an objective credible reason that is not based solely on the alleged criminal activity of defendant's location (McIntosh, 96 NY2d at 527).

Nevertheless, the majority concludes that the police

encounter here is not based solely on the alleged criminal activity in the building because defendant's presence in a TAP-enrolled building, was coupled "with the private and protected nature of that location" (Majority Op, at 6). I disagree with what is essentially the majority's "presence plus TAP" justification for a level one police intrusion, because the basis for TAP enrollment is the building's alleged history of criminal activity. A building participating in TAP is nothing other than an alleged "high crime vicinity," which, in turn, is the same proposed additional factor this Court explicitly rejected in McIntosh as insufficient to justify a request for information.

Of course, a location's reputation for criminal activity may be a factor, along with other information, that provides an officer with the credible objective reason to request information (see McIntosh, 96 NY2d at 526-27). Still, criminal activity cannot be coupled, as the majority concludes here, with such benign conduct as standing still. While the requisite objective credible reason need not indicate criminality (see De Bour, 40 NY2d at 223), it must, at least, suggest a reason to ask an individual for their identifying information (see McIntosh, 96 NY2d at 527 [request for information justified only if "a nexus to [defendant's] conduct existed"]).

There is no way of escaping the simple truth that under the majority's approach police officers are free to inquire of those who are not trespassers, such as tenants and their guests,

on the assumption that they are breaking the law by their mere presence in a TAP-enrolled building.  That type of over inclusive policing cannot be squared with our requirement that a nexus to the conduct exist, that is to say that the police must have a particularized reason to request information, based on the awareness of information or the observation of conduct (see id. at 527).  It also ignores the "considerations of reasonableness and sound State policy" (Hollman, 79 NY2d at 195), namely, the privacy interests of all persons, and our commitment to the "protect[ion of] the individual from arbitrary or intimidating police conduct" that provide "continued vitality" to the De Bour analytic framework (id.; see De Bour, 40 NY2d at 218-220).

The majority seeks to rationalize its holding, and the impact of its decision on TAP-enrolled building residents and their guests, by its assertions that "the police patrol at issue here was intended in part to combat trespassing", and that a police officer could have identified a trespasser only by requesting information (majority op, at 6).  The argument that routine police encounters, like the one at issue here, are necessary to facilitate law enforcement plainly ignores the De Bour Court's warning that "the area of crime prevention" "is highly susceptible to subconstitutional abuses" (40 NY2d at 220).  Indeed, the Court saw fit to "subject [this function] to the greatest scrutiny; for whereas a [police officer's] badge may well be a symbol of the community's trust, it should never be

considered a license to oppress" (id. at 220; see also id. at 220 n 2 [noting that certain law enforcement techniques used "to create an atmosphere of security . . . . may infringe on the privacy and freedom of individuals"]).  The majority's sanction of the blanket intrusion on the liberty of all persons encountered in a building, including those wholly innocent of any criminal activity, cannot meet such heightened review.

With respect to the contention that police can only determine whether someone is a trespasser by approaching and requesting information from an individual who is standing in a private area of a building, the same could be said of other crimes where a person could be standing in plain sight and be in violation of the law, such as, for example, crimes of possession, (see Penal Law § 265.02 [criminal possession of a weapon in the third degree]; Penal Law § 220.16 [criminal possession of a controlled substance in the third degree]).  The majority's analysis thus results in the evisceration of level one of the De Bour framework as applied to other categories of crimes, not just trespassing.

Even if this were not the case, there are no facts in the record here, or case law, in support of the majority's premise.  All that occurred here is that the officers entered the building and immediately approached the defendant and started asking him questions.  However, where an officer or third party's safety is not implicated, an officer can become aware of

information about a person that provides an articulable reason to initiate an encounter: a "nexus to conduct" (McIntosh, 96 NY2d at 527). Based on that nexus, the officer is justified in requesting information, as well as "in keeping defendant under observation" (Howard, 50 NY2d at 590).

Nevertheless, permitting an officer to request information from someone standing in a TAP-enrolled building would be problematic for another reason: the officer is not assured of a truthful answer. Based on the individual's response, the officer will either accept it as true, which may not be the case, or continue to ask questions, presumably because the officer suspects the person is not answering truthfully and is indeed trespassing. This very scenario reveals the fundamental problem with the majority's analysis. That is to say, that the initial police encounter, in practice, will, by necessity, escalate beyond a level one request for information. As this Court has explained, "[o]nce the officer asks more pointed questions that would lead the person approached reasonably to believe that [the person] is suspected of some wrongdoing and is the focus of the officer's investigation, the officer is no longer merely seeking information" (Hollman, 79 NY2d at 185). Rather than preserve the integrity of the De Bour analytic framework, this potential for the escalation of police encounters undermines the "continued vitality" of that analysis.

No less so because the request for information involved

in this case is not a "general, nonthreatening encounter in which an individual is approached for an articulable reason and asked briefly about his or her identity, destination, or reason for being in the area" (id. at 191). Instead, it is a request for information that by its nature serves to incriminate, or potentially increase an officer's suspicion of criminal activity.

Along these same lines of concern, the majority fails to address what happens if the person approached refuses to answer, and remains silent, or says "I do not have to talk to you." Or, what if the individual simply walks away? Given that an individual in a police-initiated encounter may seek to exercise that person's "right to be left alone" (People v Moore, 6 NY3d 496, 500 [2006]), and this Court's previous statements that an individual need not talk to an officer and may walk away from the police in a noncustodial encounter (see Howard, 50 NY2d at 590-91; May, 81 NY2d at 728; People v Holmes, 81 NY2d 1056, 1058 [1993]; Moore, 6 NY3d at 500), the potential for escalation seems all too likely.

The majority fails to consider what this Court clearly recognized in De Bour, namely that police encounters are fraught with tension. Even a level one encounter can cause anxiety. For, "[i]t is certainly unsettling to be approached by a police officer and asked for identification. Even though [the Court] term[ed] this a request for information, [it] d[id] not mean to suggest that a reasonable person would not be taken aback by such

a request" (<u>Hollman</u>, 79 NY2d at 192).  Accordingly, we have developed legal rules sensitive to the reality "that the tone of police-initiated encounters with civilians can be subtle and ever-shifting, that words and gestures are susceptible to many varying interpretations, and that suspicion can grow based on intangibles evident only to the eyes of a trained police officer" (<u>id.</u> at 191).

        As a final matter, although not specifically addressed by the majority, one of the People's arguments warrants consideration, given that the argument relies on general notions of fairness and just treatment under the law.  The People argue that residents of buildings in high-crime areas "are entitled to feel safe in their homes" and "should not have to contend with intruders simply because they do not have a doorman, security guard or other building employee to restrict access."  Certainly our law ensures that persons unable to afford the private security available to those with greater financial means are nonetheless guaranteed the full protection of our laws, regardless of their economic status.  That is, of course, the promise of our legal system: all are equal under the law.  However, TAP enrollment of a building known for criminal activity does not ensure for its residents an equal footing with persons living, visiting, or working in buildings with private security personnel.  The experiences of these two groups during encounters with the "security force" in their respective buildings are not

similar.  In a TAP-enrolled building the police do not know the tenants--otherwise they would have no reason to request information of those they encounter during their routine vertical sweeps.  In contrast, in a building with private security personnel, the tenants, and often their guests, are known to the building employees and thus can avoid the indignity of being assumed to be trespassers.  Moreover, in a building with private security personnel, it may be possible for the tenants to influence the application of security protocols, and choose how they want their building protected.  Here, there is nothing to suggest that the tenants participated in deciding to enroll in TAP.  Given these differences, tenants in TAP-enrolled buildings are not assured equal treatment by stripping them of their rights to be free from police encounters that fail to meet minimal standards.

*   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

Order, insofar as appealed from, affirmed.  Opinion by Judge Fahey.  Judges Pigott, Abdus-Salaam and Stein concur.  Judge Rivera dissents in an opinion in which Chief Judge Lippman concurs.

Decided October 22, 2015