Appeal by the defendant from a judgment of the Supreme Court, Nassau County (Donnino, J.), rendered May 20, 2016, convicting him of criminal possession of marihuana in the first degree, upon a jury verdict, and imposing sentence. The appeal brings up for review the denial, after a hearing pursuant to a stipulation in lieu of motions, of the suppression of physical evidence and the defendant’s statements to law enforcement officials.
 

 Ordered that the judgment is affirmed.
 

 The evidence at the defendant’s pretrial suppression hearing established that on January 30, 2014, a Federal Express (hereinafter FedEx) supervisor notified Detective Charles Johnson of the Nassau County Police Department that FedEx had shipped multiple “suspicious” packages with a return address in Santa Ana, California, to a United Parcel Service (hereinafter UPS) store in Rockville Centre. Two unidentified men unsuccessfully attempted to retrieve the packages. The packages were discovered to contain cocaine. On January 31, 2014, the next day, Detective Johnson was notified by the same FedEx supervisor that FedEx had shipped three additional suspicious packages with a return address in Marina Del Rey, California, to a UPS store in Freeport. Detective Johnson responded to the Freeport UPS store in plainclothes and observed that the packages looked similar in size and weight to the packages that were recovered the previous day from the UPS store in Rockville Centre, but were addressed to a different person and listed a different return address. Detective Johnson called for backup and the assistance of the K-9 unit. While Detective Johnson was waiting for the K-9 unit, the defendant arrived at the UPS store to retrieve the packages. Detective Johnson, whose identity as a law enforcement officer was unknown to the defendant, instructed the UPS employee to release the packages to the defendant. The defendant carried one of the boxes to an automobile parked outside and placed it inside the vehicle. The defendant returned to the UPS store with Wesley Penn, and each man carried a box back to the vehicle. They then drove away with Penn behind the wheel.
 

 Police Officer Rafael Morales and his partner, both of the Bureau of Special Operations (hereinafter BSO), followed the defendant’s vehicle in an unmarked vehicle, and two other BSO officers followed in another unmarked vehicle. Detective Johnson left the UPS store a few minutes later with a K-9 officer. The defendant’s vehicle made a right turn at the first traffic light and came to a sudden stop at the side of the road. The vehicle was “[p]artially in the roadway,” approximately 10 feet from the curb, with its engine running. The defendant and Penn exited the vehicle. Officer Morales and his partner pulled over to investigate, without activating the vehicle’s lights and siren. The second BSO unit also pulled over and parked behind Officer Morales’ vehicle. Officer Morales and his partner approached the defendant, who was standing outside the passenger side of the vehicle, and the other two BSO officers approached Penn, who was standing outside the driver’s side of the vehicle. The officers were dressed in plainclothes and approached the vehicle with their shields displayed. No weapons were drawn and no commands were given. Detective Johnson and the K-9 officer arrived at the scene within a few minutes.
 

 Officer Morales asked the defendant for identification, where he was coming from, and why they had stopped in the middle of the road. The defendant responded that he and Penn came to Freeport to work “odds and ends” jobs. Detective Mark Maniet and another police officer arrived at the scene “[w]ithin a couple of minutes.” The officers were dressed in plainclothes and no weapons were drawn. Detective Maniet asked the defendant the same general questions that were asked by Officer Morales. The defendant was “very cooperative” and the tone of the conversation was “[c]asual.” When Detective Maniet asked the defendant about the contents of the box in the backseat of the vehicle, the defendant responded: “weed.” The K-9 officer and a dog trained to detect the odor of narcotics circled the vehicle. The dog alerted the K-9 officer to the presence of drugs, and the defendant was placed under arrest.
 

 At the close of the suppression hearing, the defendant argued that he was not free to leave when the officers approached him and questioned him about the box, and that his statements about the content of the box were the product of an unlawful custodial interrogation. Accordingly, the defendant argued that his statements and the contents of the boxes should be suppressed. The Supreme Court denied suppression, concluding that the officers had reasonable suspicion to believe that the defendant had committed a crime when they approached him and questioned him about the box. However, the court held, in any event, that the defendant was not detained at the time he made the incriminating statement, and that the officers’ conduct amounted to, at most, a request for information or a common-law right of inquiry. After a jury trial, the defendant was convicted of criminal possession of marihuana in the first degree.
 

 “At the suppression hearing, the People had the burden of going forward to establish the reasonableness of the police conduct, and the defendant ultimately had the burden of proving, by a preponderance of the evidence, that the police conduct was illegal” (People v Lucifero, 146 AD3d 811, 812-813 [2017]). “In People v De Bour (40 NY2d 210 [1976]), the Court of Appeals established a graduated four-level test for evaluating the propriety of police encounters when a police officer is acting in a law enforcement capacity. The first level permits a police officer to request information from an individual, and merely requires that the request be supported by an objective, credible reason, not necessarily indicative of criminality. The second level, known as the common-law right of inquiry, requires a founded suspicion that criminal activity is afoot, and permits a somewhat greater intrusion. The third level permits a police officer to forcibly stop and detain an individual. Such a detention, however, is not permitted unless there is a reasonable suspicion that an individual is committing, has committed, or is about to commit a crime. The fourth level authorizes an arrest based on probable cause to believe that a person has committed a crime” (People v Karagoz, 143 AD3d 912, 913-914 [2016] [internal quotation marks omitted]; see People v De Bour, 40 NY2d at 223).
 

 As an initial matter, we agree with the Supreme Court’s conclusion that the defendant was not detained when he disclosed to the officers that the package in the rear of the car contained marihuana. The “[determination [of] whether a seizure occurred . . . requires the fact finder to apply a settled standard: whether a reasonable person would have believed, under the circumstances, that the officer’s conduct was a significant limitation on his or her freedom” (People v Ocasio, 85 NY2d 982, 984 [1995]; see People v Loper, 115 AD3d 875, 878 [2014]). “That involves consideration of all the facts—for example, was there a chase; were lights, sirens or a loudspeaker used; was the officer’s gun drawn, was the individual prevented from moving; how many verbal commands were given; what was the content and tone of the commands; how many officers were involved; where did the encounter take place” (People v Ocasio, 85 NY2d at 984, citing People v Bora, 83 NY2d 531 [1994]). “Whether a police intrusion has amounted to a forcible stop and detention turns on whether there has been ‘a significant interruption with an individual’s liberty of movement’ ” (People v Loper, 115 AD3d at 878, quoting People v De Bour, 40 NY2d at 216; see People v Bora, 83 NY2d at 534). Here, the defendant’s vehicle had already stopped and the defendant had already exited when the officers approached. The officers’ guns were not drawn, and the tone of the conversation was described as “[c]asual.” Under these circumstances, we conclude that the defendant was not detained when he made the incriminating statement (see People v Ocasio, 85 NY2d at 984; People v Lewis, 150 AD3d 1264 [2017]; People v Vizcaino, 148 AD3d 481, 481 [2017]; People v Francois, 61 AD3d 524, 525 [2009], affd 14 NY3d 732 [2010]; People v Shankle, 37 AD3d 742 [2007]).
 

 Further, based upon the information received from the FedEx supervisor and Detective Johnson’s examination of the subject packages, which were similar in size and shape to packages that were recently determined to contain illegal substances, and the fact that the defendant and Penn abruptly exited their vehicle after it stopped while partially blocking the roadway, the officers possessed founded suspicion that criminal activity was afoot, triggering the common-law right to inquire when they approached the defendant (see People v Couch, 104 AD3d 955, 956 [2013]; People v Bolta, 96 AD3d 773, 773-774 [2012]; see also People v Hollman, 79 NY2d 181, 191 [1992]). Accordingly, the defendant was not entitled to suppression of his incriminating statement in response to the officers’ lawful inquiry, or the contents of the subsequently seized packages.
 

 Contrary to the defendant’s contention, the Supreme Court properly denied the defendant’s challenge pursuant to Batson v Kentucky (476 US 79 [1986]) without requiring the prosecutor to offer a race-neutral reason for exercising a peremptory challenge to strike the only prospective African-American juror during the first two rounds of voir dire. Where a party contends that opposing counsel has used peremptory challenges in a discriminatory manner, the trial court must engage in a three-step process for evaluating that contention: “ ‘The first step requires that the moving party make a prima facie showing of discrimination in the exercise of peremptory challenges; the second step shifts the burden to the nonmoving party to provide race-neutral reasons for each juror being challenged; and the third step requires the court to make a factual determination as to whether the race-neutral reasons are merely a pretext for discrimination’ ” (People v Jones, 139 AD3d 878, 879 [2016], quoting People v Carillo, 9 AD3d 333, 334 [2004]). A party asserting a Batson challenge “ ‘should articulate and develop all of the grounds supporting the claim, both factual and legal, during the colloquy in which the objection is raised and discussed’ ” (People v Gamble, 137 AD3d 1053, 1054 [2016], quoting People v Childress, 81 NY2d 263, 268 [1993]). Here, the defendant noted only that the prosecutor used a peremptory challenge to strike the only prospective African-American juror during the first two rounds of voir dire. Under the circumstances of this case, that fact was insufficient, without more, to create an inference of purposeful discrimination in the prosecutor’s use of a peremptory challenge. The defendant made no showing during the colloquy of any other relevant circumstances sufficient to raise an inference of discriminatory purpose (see People v Jenkins, 84 NY2d 1001, 1002-1003 [1994]; People v Chance, 125 AD3d 993, 994 [2015]; People v Ali, 123 AD3d 1137, 1138 [2014]; People v Cuesta, 103 AD3d 913, 915 [2013]; People v Christiani, 96 AD3d 870, 872 [2012]; People v Hunt, 50 AD3d 1246, 1247 [2008]). Accordingly, the Supreme Court correctly determined that the defendant failed to make a prima facie showing of discrimination, and the burden did not shift to the prosecution to respond with a race-neutral explanation (see People v Rudolph, 132 AD3d 912, 913 [2015]; People v Cuesta, 103 AD3d at 915; People v Zapata, 98 AD3d 539, 540 [2012]).
 

 Chambers, J.P., Miller, Barros and Connolly, JJ., concur.