People v Gates (2018 NY Slip Op 03096)

People v Gates

2018 NY Slip Op 03096 [31 NY3d 1028]

May 1, 2018

Court of Appeals

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

As corrected through Wednesday, June 27, 2018

[*1]

The People of the State of New York, Appellant,
v
Ricky D. Gates, Respondent.

Decided May 1, 2018

People v Gates, 152 AD3d 1222, affirmed.

APPEARANCES OF COUNSEL

Kristyna S. Mills, District Attorney, Watertown (George R. Shaffer, III, of counsel), for appellant.
D.J. & J.A. Cirando, Esqs., Syracuse (John A. Cirando of counsel), for respondent.

{**31 NY3d at 1029} OPINION OF THE COURT

Memorandum.
The order of the Appellate Division should be affirmed.
The Appellate Division did not err in rejecting the People's argument that defendant could not challenge on appeal a suppression ruling that was not reduced to writing. Record evidence supports the Appellate Division's suppression determination and, accordingly, that determination is beyond this Court's further review. To the extent the dissent questions the continued utility of the De Bour paradigm for analyzing encounters between police and members of the public (People v De Bour, 40 NY2d 210 [1976]) and suggests that People v Garcia (20 NY3d 317 [2012]) was wrongly decided, those questions are not presented here where the parties litigated this case within the framework of our existing precedent.

Garcia, J. (dissenting). In this traffic stop case, the majority affirms the Appellate Division's order vacating defendant's guilty plea, suppressing all evidence in support of the crimes charged, and dismissing the indictment (see People v Gates, 152 AD3d 1222, 1223 [4th Dept 2017]). In my view, the Appellate Division's determination is unsupported by the record and ignores the inherent and material differences between street and roadside encounters. I therefore dissent.
I.
More than 40 years ago, in People v De Bour (40 NY2d 210 [1976]), this Court established a four-tiered framework for evaluating police-citizen encounters. Where a police officer "seeks simply to request information from an individual," that level-one request must be supported by "an objective, credible reason, not necessarily indicative of criminality" (People v Hollman, 79 NY2d 181, 184 [1992]). A level-two encounter (also known as the "common-law right of inquiry") requires a "founded suspicion that criminal activity is afoot" and permits a "somewhat greater" intrusion than level one (id. at 184-185 [citation and internal quotation marks omitted]). At level three, a police officer is authorized to forcibly stop and detain an individual where the officer has reasonable suspicion that the particular individual was involved in a felony or misdemeanor (id. at 185). An arrest is authorized at the fourth and final level,{**31 NY3d at 1030} where the officer has "probable cause to believe that a person has committed a crime" (id.).
The De Bour method differs significantly from the federal approach—a Fourth Amendment inquiry—which recognizes that not all police encounters trigger constitutional scrutiny (see Florida v Bostick, 501 US 429, 434 [1991] [noting that the Fourth Amendment is not implicated "simply because a police officer approaches an individual and asks a few questions"]). Where it is implicated, the Fourth Amendment's analysis is guided by "the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security" (Pennsylvania v Mimms, 434 US 106, 109 [1977] [citation and internal quotation marks omitted]). Reasonableness, in turn, "depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers" (id. [citation and internal quotation marks omitted]). The "familiar threshold standard" employed in a Fourth Amendment analysis—probable cause—"has roots that are deep in our history"; its use "reflects the benefit of extensive experience accommodating the factors relevant to the 'reasonableness' requirement of the Fourth Amendment," and provides the "simplicity and clarity necessary to the implementation of a workable rule" (Dunaway v New York, 442 US 200, 213 [1979]).
The De Bour standard, by contrast, imposes "three separate and distinct evidentiary standards below probable cause" (4 Wayne R. LaFave, Search and Seizure § 9.4 [e] [5th ed 2012]): an "objective, credible reason," which is less than a "founded suspicion," which is less than "reasonable suspicion." In practice, even with judicial policing of on the spot law enforcement assessments, the implementation of De Bour has created "inconsistency in the evaluation of markedly similar police encounters" (People v Hollman, 79 NY2d 181, 185 [1992]). The difference between level one and level two, for instance, is a "subtle" one, often based on "intangibles" discernable "only to the eyes of a trained police officer"; the two levels are "so close in meaning" that "courts have struggled" to differentiate them, and their legal significance can "become obscured" (id. at 185, 188, 191). For example, a question regarding the ownership of a bag has been labelled a level-two inquiry (id. at 193). But asking whether an individual "checked [any] luggage" reaches only level one (id.). A question "about the contents" of a bag is sometimes a level-one inquiry (People v Moore, 47 NY2d 911,{**31 NY3d at 1031} 912 [1979], revg for reasons stated in dissenting op 62 AD2d 155 [1st Dept [*2]1978]). But other times, it can be a level-two (Hollman, 79 NY2d at 191, 194). And an officer may direct the occupants of a lawfully stopped vehicle to get out of the car (People v Robinson, 74 NY2d 773, 774 [1989]), but apparently cannot ask about the contents of their many large bags without a founded suspicion of criminality (see majority op at 
1029). Evidently, the De Bour sliding scale generates "such confusion and uncertainty that neither police nor courts can ascertain with any degree of confidence precisely what it takes to meet any of these standards" (4 LaFave, Search and Seizure § 9.4 [e]).
The "hyper-stringent" rule of De Bour also serves as a barrier to legitimate, effective, and minimally-intrusive law enforcement practices designed to detect and ward off threats at their earliest stages (see People v Garcia, 20 NY3d 317, 324, 326 [2012, Smith, J., dissenting]). Whereas federal law dictates that "mere police questioning" generally does not trigger constitutional protections (see Bostick, 501 US at 434), the De Bour standard "forbids police officers to talk to people they meet in the street unless certain preconditions are met" (Garcia, 20 NY3d at 324 [Smith, J., dissenting]). In particular, the Fourth Amendment recognizes that "a policeman who lacks the precise level of information necessary for probable cause to arrest" is not required to "simply shrug his shoulders and allow a crime to occur or a criminal to escape" (Adams v Williams, 407 US 143, 145 [1972]). Federal search and seizure principles similarly account for the "need for law enforcement officers to protect themselves and other prospective victims of violence in situations where they may lack probable cause for an arrest" (Michigan v Long, 463 US 1032, 1047 [1983] [citation and internal quotation marks omitted]). Under De Bour, however, an officer cannot, without the requisite level of suspicion, conduct a consensual search of a bag in the Port Authority Bus Terminal (Hollman, 79 NY2d at 187, 194), or ask the four occupants of a lawfully stopped vehicle if they have any weapons (Garcia, 20 NY3d at 320-321).
And because De Bour "requires the suppression of evidence derived from a forbidden conversation" (Garcia, 20 NY3d at 324 [Smith, J., dissenting]), it commands a resource-intensive, case-by-case inquiry into the existence of the "very minimal grounds" required to initiate a level-one encounter (4 LaFave, Search and Seizure § 9.4 [e]). For the same reason, it creates a{**31 NY3d at 1032} regime wherein the merit of a defendant's suppression motion may depend entirely on whether he is prosecuted at the state or federal level (see e.g. United States v Winkfield, 2016 WL 4190415, 2016 US Dist LEXIS 104260 [SD NY, Aug. 1, 2016, 16-cr-00098 (ALC)]). In short, the analytical framework of De Bour serves, in many ways, to undermine the goals of clarity, public safety, and judicial economy.
For these reasons, among others, the United States Supreme Court has sharply criticized—and outright rejected—a similar proposed scheme, noting that "subtle verbal gradations may obscure rather than elucidate" the standards applicable to police practices (United States v Montoya de Hernandez, 473 US 531, 541 [1985]; see also Dunaway, 442 US at 213). The use of a "single, familiar standard," the Supreme Court has noted, is "essential to guide police officers, who have only limited time and expertise to reflect on and balance the social and individual interests involved in the specific circumstances they confront" (Dunaway, 442 US at 213-214). Our State's De Bour standard, however, imposes a rigid, complex, and graduated scale on encounters that are often fluid, dynamic, and developing (see De Bour, 40 NY2d at 225).
II.
The De Bour framework applies not only to street encounters, but also to traffic stops (see People v Garcia, 20 NY3d 317 [2012])—encounters inherently "fraught with danger to police officers" (Long, 463 US at 1047; People v Robinson, 74 NY2d 773, 774 [1989]). In a vehicle, a "driver can make unobserved movements," thereby increasing "the likelihood that the officer will be the victim of an assault" (Pennsylvania v Mimms, 434 US 106, 110 [1977] [noting that "a significant percentage of murders of police officers occurs when the officers are making traffic stops" (citations and internal quotation marks omitted)]). Unlike a suspect on foot, the occupants of a vehicle "may injure police officers and others by virtue of their access to weapons, even though they may not themselves be armed" (Long, 463 US at 1048). Traffic stops also involve an appreciable risk of "accidental injury from passing traffic" (Mimms, 434 US at 111), and the "ready mobility" of automobiles further creates "circumstances of . . . exigency" not present in a street encounter (California v Carney, 471 US 386, 390-391 [1985] [citation and internal quotation marks omitted]; Carroll v United States, 267 US 132, 153 [1925]). During these "especially {**31 NY3d at 1033}hazardous" scenarios (Long, 463 US at 1049), officers are often compelled to make split-second, roadside judgment calls.
[*3]
Moreover, in the context of a traffic stop, the occupants of the vehicle have already been stopped—a "level three temporary detention" in De Bour terms (Garcia, 20 NY3d at 326 [Smith, J., dissenting])—and an officer may lawfully direct the occupants to step out of the car (Robinson, 74 NY2d at 774). The lesser intrusion of police questioning, in a context where citizens already have "reduced expectations of privacy" (Carney, 471 US at 392), amounts to, "at most[,] a mere inconvenience" (Mimms, 434 US at 111). Because of the "inordinate risk confronting an officer as he approaches a person seated in an automobile" (id. at 110), and citizens' diminished privacy expectations on the road, the Supreme Court has repeatedly recognized that roadside police encounters are fundamentally different from—and more dangerous than—their on-foot counterparts (e.g. Carney, 471 US at 390-393; Long, 463 US at 1047; Mimms, 434 US at 109-111; Carroll, 267 US at 153).
III.
In this case, the Trooper stopped defendant's vehicle after 10:00 p.m. for speeding. The stop occurred on a highway, and there was traffic that night. Initially, the Trooper noticed that the rear of defendant's vehicle was "sagging excessively," indicating that a "heavy object" was in the back of the car or the trunk. After approaching the vehicle, the Trooper—who was alone—found three individuals in the vehicle: a male driver (defendant), a male passenger in the front seat, and a male passenger in the back seat. The Trooper also observed a number of large nylon bags piled on the back seat and floor of the car. He could not see "every square inch" of the bags, but the Trooper noticed that they had "sharp edges protruding from the inner wall[s]" as if "some type of hard objects" were inside. All of the occupants in the vehicle displayed an "overly nervous" demeanor, and the passengers were "making a point not to make any eye contact." The Trooper asked defendant where he was going—a level-one request for information—and defendant responded that he had been visiting family in Ohio for a few days. The Trooper, who had 13 years of experience with the New York State Police and had made "several hundred" drug arrests, believed that "some type of illegal activity" was occurring—namely, that defendant was illegally transporting "cash" or "some type of narcotics."
{**31 NY3d at 1034}The Trooper's next question, which concerned the contents of the nylon bags, forms the basis of this appeal. The Appellate Division majority, reversing County Court, determined that "the Trooper's initial inquiry concerning the contents of the bags constituted a level two common-law inquiry, which required a founded suspicion of criminality that was not present at the time" (People v Gates, 152 AD3d 1222, 1223 [4th Dept 2017]). By contrast, the two dissenting Justices believed that "the Trooper followed up with . . . an additional appropriate level one question, i.e., whether defendant's luggage was in the bags, which were numerous, were in plain view, and looked unusual based upon the sharp edges protruding through the nylon fabric" (id. at 1225 [Winslow and Scudder, JJ., dissenting]). Both the majority and the dissent agreed that defendant's subsequent responses to the Trooper's questioning, which ranged from inconsistent to blatantly untruthful, elevated the level of suspicion, justifying a more invasive inquiry.[FN*] Ultimately, defendant admitted that he was transporting untaxed cigarettes and was arrested.
Whether viewed as a "level one" or "level two" inquiry under De Bour, I believe the Trooper's conduct was both reasonable and supported by the requisite suspicion. Initially, the degree of interference was minimal. The Trooper's questioning was neither "extended" nor "accusatory" (Hollman, 79 NY2d at 191); rather, the inquiry at issue was one of the Trooper's preliminary questions and was directly related to his observations—the bags were in [*4]plain view. Even if "unsettling," the inquiry was "nonthreatening" and "lacking in harassment or intimidation" (id. at 189, 191, 192). In addition, the Trooper's observations of the vehicle, its occupants, and its contents generated ample suspicion, and the Trooper's extensive experience related to illegal contraband allowed him to appreciate the circumstances in a manner that may have been "evident only to the eyes of a trained police officer" (id. at 191); defendant was behaving nervously and "carrying something" that, viewed {**31 NY3d at 1035}through the Trooper's eyes, appeared "unusual"—a large number of sharp-edged bags in the sagging rear of the vehicle. Even under our established De Bour standard, the Trooper "can ask about" that (id.; see also Moore, 47 NY2d at 912).
More fundamentally, I disagree with the Appellate Division's failure to account for the inherent differences between traffic stops and street encounters. When the Trooper stopped defendant's vehicle, he was alone, on a dark road, unaware of who or what he would find in the car; as in most traffic stops, he was "particularly vulnerable" (Long, 463 US at 1052). Upon approaching the vehicle on the side of the highway, with traffic passing by, the Trooper found three male occupants, including one passenger seated next to the large nylon bags. Standing by the driver's side window, the Trooper could observe some but not all of the occupants' movements and surroundings. Under those circumstances, the Trooper's inquiry into the contents of the bags was a prudent "precautionary measure to afford [him] a degree of protection" (Mimms, 434 US at 110). And the "incremental intrusion" on defendant, if any, was minimal (id. at 109; see also Garcia, 20 NY3d at 325-326 [Smith, J., dissenting]).
IV.
Every day, we ask our fellow New Yorkers to do their part to detect and report suspicious behavior: "If you see something, say something" (see U.S. Department of Homeland Security, If You See Something, Say Something, https://www.dhs.gov/see-something-say-something [accessed Apr. 23, 2018], cached at 
http://www.nycourts.gov/reporter/webdocs/IfYouSeeSomethingSaySomethingHomeland Security.pdf; MTA, Security, http://www.mta.info/mta-security [accessed Apr. 23, 2018]; New York State, Programs, See Something, Send Something, https://www.ny.gov/programs/see-something-send-something [accessed Apr. 23, 2018], cached at
http://www.nycourts.gov/reporter/webdocs/SeeSomethingSendSomethingTheStateofNewYork.pdf). But we leave law enforcement powerless to do the same—including those routinely exposed to the "inherent and inordinate danger" of roadside encounters (Robinson, 74 NY2d at 774). And we are one of the only states, if not the only state, to do so (Garcia, 20 NY3d at 324 [Smith, J., dissenting]).
Whether or not it is time to reevaluate the vitality of De Bour, I disagree with the conclusion that a Trooper who approaches{**31 NY3d at 1036} a vehicle with a sagging trunk, alone and at night, and finds three male passengers behaving nervously cannot ask the driver about the contents of a number of large, unusually-shaped bags piled on the floor and back seat. Accordingly, I dissent.
Chief Judge DiFiore and Judges Rivera, Stein, Fahey, Wilson and Feinman concur; Judge Garcia dissents in an opinion.
On review of submissions pursuant to section 500.11 of the Rules of the Court of Appeals (22 NYCRR 500.11), order affirmed, in a memorandum.

Footnotes

Footnote *:Defendant first stated that the bags contained his clothing—a response that did not comport with the Trooper's own observations. When the Trooper mentioned the bags' sharp edges and asked whether defendant's clothing was "inside boxes," defendant changed his answer, stating that "there were not clothes in the bags, there were presents" for his family. In response to the Trooper's follow-up questions, defendant's answers grew increasingly implausible: he stated that the bags contained "riding toys," specifically, "bicycles." He eventually disclosed that the bags contained boxes of untaxed cigarettes.