People v Brooks (2025 NY Slip Op 51413(U))

[*1]

People v Brooks

2025 NY Slip Op 51413(U)

Decided on August 6, 2025

County Court, Tompkins County

Miller, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on August 6, 2025
County Court, Tompkins County

People of the State of New York

against
Breon Brooks, Defendant.

Ind. No. 70332-24

Tompkins County District Attorney Matthew Van Houten, Esq.
Jerome Mayersak, Esq., counsel for Defendant Breon Brooks

Scott A. Miller, J.

Procedural Posture
Defendant is charged under a four-count indictment with Criminal Possession of a Weapon in the Second Degree, two counts of Criminal Possession of a Controlled Substance in the Third Degree, and Criminal Possession of a Controlled Substance in the Fourth Degree. He entered a not guilty plea on October 9, 2024.
On January 28, 2025, Defendant filed omnibus motions, including a request to dismiss the indictment based on alleged defects in the grand jury proceeding and legal insufficiency, as well as a motion to suppress physical evidence and statements. The People opposed. By Decision and Order dated April 7, 2025, the Court denied Defendant's motions to dismiss, finding that the grand jury proceedings conformed with CPL Article 190, that the prosecutor's legal instructions were proper, and that the evidence presented was legally sufficient when viewed in the light most favorable to the People. The Court also granted an evidentiary hearing on suppression issues pursuant to De Bourand Huntley. See this Court's April 7th 2025 Decision & Order. (emphasis added). The suppression hearing was held on May 27, 2025. Law enforcement Body Worn Camera (BWC) evidence was received into evidence by stipulation.
Findings of Fact
On the morning of January 4, 2023, members of the Ithaca Police Department were conducting surveillance as part of a narcotics investigation targeting William Ellison, a.k.a. "Dice," at 227 South Geneva Street. Investigators Benjamin Buck and Dana Haff were members [*2]of the surveillance and arrest team. A valid search warrant had been issued for Ellison and the premises.
Earlier that morning, investigators observed Breon Brooks, a known associate of Ellison, visit the residence. Brooks and Ellison subsequently walked together toward a nearby 7-Eleven. Ellison entered the store while Brooks returned alone to his parked gray BMW, located in the Hotel Ithaca lot behind the 7-Eleven.
At approximately that same time, law enforcement officers—including a SWAT team— executed the search warrant and arrested Ellison inside the 7-Eleven. Upon observing the police presence, Brooks entered his vehicle and began driving south toward Clinton Street. Investigators Buck and Haff, traveling northbound in an unmarked Dodge Durango, encountered Brooks traveling in the opposite direction within a narrow alleyway. Brooks reversed into a nearby parking space.
Buck and Haff exited their vehicle and approached Brooks, who had just exited his own vehicle and was leaning against the hood of his BMW. Investigator Buck testified that Brooks' right pants pocket appeared slightly turned out, which he interpreted as indicative of recently removing an item. According to both investigators, a brief conversation ensued during which Brooks was asked whether he possessed any drugs or contraband on his person or in his car. Both investigators testified that Brooks voluntarily admitted to having narcotics and a "baby Glock" handgun in the vehicle.
Neither Buck nor Haff was equipped with a body-worn camera. Sergeants Allard and Slattery, who arrived moments later, were equipped with body-worn cameras. Although the BWC footage begins after Brooks allegedly made the admissions, it captured his continued interaction with police. The footage clearly shows that Buck and Haff were wearing their firearms holstered at their sides and standing in close proximity to Brooks—one on either side of him—as he leaned against his vehicle.
The Court credits Brooks' account that, immediately upon being approached by Investigators Buck and Haff and flanked on both sides, he did not feel free to leave. Although the BWC does not capture the exact moment of the alleged admissions, it supports Brooks' testimony that he was effectively detained almost immediately. Nonetheless, the Court finds that whether or not Brooks was detained is immaterial to resolution of the suppression motion, as is the fact that he was not Mirandized at the time of questioning.
The officers arrested Brooks, obtained a search warrant from Ithaca City Court (Wallace, J.) based upon Defendant's admissions and subsequently located and secured illegal controlled substances (crack/heroin/fentanyl) and a weapon (Taurus firearm) from Defendant's BMW upon warrant execution.

Conclusions of Law
It is well established that when evaluating police action during street encounters, the court must determine whether it was justified at its inception and reasonably related in scope to the circumstances at the time. People v. De Bour, 40 NY2d 210, 215 (1976). In De Bour, the Court of Appeals articulated a four-level graduated framework for assessing the legality of police-initiated street encounters:
-Level I permits an officer to approach an individual and request information. This level [*3]requires only an objective, credible reason, not necessarily indicative of criminality. The brevity of the encounter and the absence of harassment or intimidation are relevant in determining whether the interaction remained within this level. People v. Hollman, 79 NY2d 181, 190 (1992).
-Level II, known as the common-law right of inquiry, permits a somewhat greater intrusion and requires a founded suspicion that criminal activity is afoot. De Bour, 40 NY2d at 223; Hollman, 79 NY2d at 184.
 -Level III allows an officer to forcibly stop and detain an individual based on reasonable suspicion that the person has committed, is committing, or is about to commit a crime. Hollman, 79 NY2d at 184.
 -Level IV involves arrest and requires probable cause to believe the person has committed a crime. Each progressive level authorizes a greater degree of intrusion and consequently requires an escalating quantum of suspicion. Hollman, 79 NY2d at 185.
Here, the detectives' accusatory inquiry—"Do you have any drugs/work/contraband on you or in the car?"—was not a mere Level I request for information but constituted a Level II common-law inquiry. As such, it required a founded suspicion that Brooks was "afoot" in criminal activity. That standard was not met. Brooks was not named in the search warrant. Brooks was not a resident of the target's home. Brooks had already departed the premises before the search warrant was executed. Brooks was not observed engaging in any conduct indicative of illegality. The fact that he visited the target's residence is not sufficient to establish a founded suspicion of criminality. Brooks' slightly upturned pants pocket most certainly does not rise to the level of an articulable indicia of criminal conduct. See, People v. Holmes, 81 NY2d 1056, 1058 (1993) ("[A] bulging jacket pocket is hardly indicative of criminality. As we have recognized, a pocket bulge, unlike a waistband bulge, 'could be caused by any number of innocuous objects,'" quoting, De Bour at 221). A merely empty or slightly upturned pocket is even less suspicious and susceptible to a myriad of innocent explanations.
Even fully crediting the investigators' account that Brooks made immediate admissions, those admissions were the product of a Level II inquiry unsupported by a founded suspicion of criminality. As such, the admissions—and the search warrant obtained as a result—must be deemed the fruit of an impermissible and unlawful intrusion. "Where a police encounter is not justified in its inception, it cannot be validated by a subsequently acquired suspicion." People v. William II, 98 NY2d 93, 98 (2002). Under well-established exclusionary rule principles, where police have engaged in impermissible activity, such as asking the Defendant whether he was in possession of illegal contraband, any "evidence which is a result of the 'exploitation of that illegality' is subject to suppression as the 'fruit of the poisonous tree.'" People v. Small, 110 AD3d 1138, 1140 (3rd Dept. 2013), quoting, Wong Sun v. United States, 371 U.S. 471, 488 (1963).
Whether Brooks was formally detained, in custody, or advised of his Miranda rights is immaterial. The constitutional violation stems from the investigators' lack of founded suspicion of criminality, which prohibited the immediate and accusatory inquiry of Brooks whether he possessed any illegal contraband.
Accordingly, Defendant's motion to suppress all the physical evidence recovered from the vehicle (drugs, scale and firearm) as well as Defendant's admissions obtained as a result of [*4]the impermissible Level 2 De Bour/Hollman inquiry is GRANTED.
The jury trial scheduled for September 2, 2025 is adjourned. The indictment remains pending, and the People may elect either to move to dismiss the indictment, or to pursue any further relief to which the People are entitled under law, including interlocutory appeal pursuant to CPL § 450.20(8) and § 450.50.
Defendant is currently released upon a $50,000.00 insurance bond, which bond shall remain in place until further order of this Court.
This constitutes the Decision and Order of the Court. A notice of appeal, if applicable, must be filed within thirty (30) days of the date of this decision and order.
Dated: August 6, 2025
Ithaca, New York
Hon. Scott A. Miller
Tompkins County Court